Village of Winfield, an Illinois Municipal Corporation, for the Use of Harry W. Kuhn, Inc., an Illinois Corporation, Plaintiff-Appellee, v. Reliance Insurance Company, a Corporation and Vincent Di Vito, Defendants-Appellants.

Gen. No. 65–10.

Second District.

November 5, 1965.

Rehearing denied December 9, 1965.

Samuel Morgan, George Brode, and Dent, Hampton & Doten, all of Chicago, for appellants.

John Demling, of Glen Ellyn, for appellee.

MR. JUSTICE DAVIS delivered the opinion of the court.

The issue before this Court is whether, under the circumstances of this case, the plaintiff, Harry W. Kuhn, Inc. (herein called Kuhn), as a creditor of the defendant, Vincent Di Vito (herein called Di Vito), made an im-

proper application of funds which Di Vito had received from the Village of Winfield (herein called Winfield) and had paid to Kuhn.

On or about October 19, 1960, Di Vito was awarded the contract for the construction of a sanitary sewer system in the Village of Winfield. De Vito procured a bond for the payment of all labor and materials furnished by subcontractors, as required by the provisions of Ill Rev Stats 1963, c 29, (Contracts), sec 15. The Standard Accident Insurance Company, which was subsequently merged into The Reliance Insurance Company, was surety on the bond. Kuhn furnished gravel and hauling services, as a subcontractor, on the Winfield project and subsequently brought this action against Di Vito and the surety, under the provisions of Ill Rev Stats 1963, c 29, sec 16, for monies due him for such labor and materials.

During the period beginning January 26, 1961 and ending November 18, 1962, Di Vito paid $11,500 to Kuhn. Defendants urge that these payments were made from funds derived from the Winfield project; that Kuhn wrongfully applied them to antecedent debts of Di Vito and may not, under the doctrine of Alexander Lumber Co. v. Aetna Acc. & Liability Co., 296 Ill 500, 129 NE 371 (1921), recover from Di Vito and the surety for labor and materials furnished in connection with the Winfield project. Kuhn contends, and the trial court in the bench trial found, that applying the first-in, first-out principle, only $3,000 of the payments received by Kuhn were from Winfield funds; and that after crediting this amount to the total indebtedness due from Di Vito on the Winfield project, there remained due to Kuhn thereon, the sum of $8,316.15, for which both Di Vito and the surety were liable. This appeal is from the judgment entered in the trial court in favor of the plaintiff in that amount.

Kuhn made the first delivery on the Winfield job in November of 1960. At that time Di Vito owed Kuhn

$4,715.56 on non-Winfield jobs. Between November 1960 and January 26, 1961, Kuhn provided services and materials on the Winfield job totalling $200. On the latter date, when he had a bank balance of $7,382.51, none of which was derived from Winfield sources, Di Vito deposited the sum of $32,980 from the Winfield project and $2,325.33 from other sources and paid Kuhn $2,000. Applying the first-in, first-out principle, none of this $2,000 payment was from Winfield funds.

Thereafter, on February 10 and 14 and March 8, Di Vito deposited $17,120.55 from non-Winfield sources. On March 16, his bank balance was $3,535.17, after which he deposited $48,200 from the Winfield project. On the next day—March 17, 1961, Di Vito paid Kuhn $2,000. Continuing with the first-in, first-out principle, this payment was also from non-Winfield funds.

On March 23 and April 18, Di Vito received $8,285 of non-Winfield funds; on April 24, he received $25,820 from the Winfield project; and on May 10, 1961, when his balance was $15,537.02, Di Vito paid Kuhn the sum of $1,500, which under the first-in, first-out principle, was all from Winfield funds.

Thereafter, on May 15, June 1 and 2, Di Vito deposited a total of $17,100, none of which was Winfield money; on June 16, he deposited $25,400 of Winfield funds, and on June 19, 1961, paid Kuhn $1,500 when his bank balance was then $29,665.45. As only the last $25,400 of this balance was Winfield money, the $1,500 did not come from Winfield sources.

Between June 30 and July 10, 1961, Di Vito deposited $4,706 from sources other than Winfield. On July 17, 1961, he paid Kuhn the sum of $1,500, when his bank balance totalled $9,339.60. As only the last $4,706 of this balance was non-Winfield funds, all of the $1,500 payment was from Winfield funds.

On July 18, 1961, Di Vito deposited $32,000 from the Winfield project. The Di Vito bank statement for the

month of August was not produced, but his bank balance as of July 31 was $11,042.03 and the balance as of August 31 was $36,391.73. While we do not know the full extent of deposits and withdrawals during August, we do know that there was a net gain of $25,349.70, all of which was from non-Winfield sources. On September 16, at a time when his bank balance totalled $18,300.74, Di Vito paid Kuhn another $1,000. This payment was derived from the deposits made in August and was not, therefore, from the Winfield funds.

Thereafter, from September through November, substantial amounts were deposited from non-Winfield sources. Nothing was deposited from the Winfield project. The last payment made to Kuhn was on November 18, 1961, in the sum of $2.000. None of this was from Winfield funds. Under the theory advanced by Kuhn, it is clear that of the $11,500 paid by Di Vito to Kuhn, only $3,000 can be traced to Winfield funds. Applying this as a credit on the amount due for the Winfield project, Kuhn had the sum of $8,316.15 remaining due to him.

The application of voluntary payments by the creditor, either with or without direction from the debtor, and where neither has made an appropriation thereof, the application by the court, as well as the rights of third parties secondarily liable on one or more of the debts under consideration, has produced a substantial body of law wherein courts have applied diverse rules to the end of dispensing intrinsic justice between the parties. 29 ILP (Payments) secs 21, 22 and 23, pp 492–500; 26 West's Ill Digest, (Payments) secs 36–47 incl, pp 382–392; Callaghan's Ill Digest, (Payments) secs 22–28, pp 608–616; 70 CJS (Payments) secs 50–80, pp 255–282; 40 Am Jur (Payments) secs 108–150, pp 790–817.

In Dehner v. Helmbacher Forge & Rolling Mills, 7 Ill App 47 (4th Dist 1880) at page 49 the court succinctly stated the general rule pertaining to the application of payments in these words:

257

"Where a debtor makes a payment to his creditor, to whom he is indebted on several accounts, he has the right to indicate upon which item the payment shall apply. If he does not do so, the creditor may ordinarily select the item, and if no selection is indicated by either, the law will apply the payment as may seem reasonable and just. And in such cases the application will ordinarily be made upon the item first due. Lowry v. Gear, 32 Ill 382; Bayley v. Wyncoop, 5 Gil 459; Sprague v. Hazenwinkle, 53 Ill 419; Bonnel v. Wieder, 67 Ill 327."

■ ■ There are a number of cases in Illinois which hold that where the debtor makes no direction as to the application of a payment, to a creditor holding various claims, and no application is made by the creditor, the law will apply the payment most advantageously to the creditor. Haas Electric & Mfg. Co. v. Springfield Amusement Park Co., 236 Ill 452, 464, 86 NE 248 (1908) ; Barbee v. Morris, 221 Ill 382, 383, 384, 77 NE 589 (1906) ; Monson v. Meyer, 190 Ill 105, 107, 108, 60 NE 63 (1901). It is also the law in Illinois that the general rules regarding the appropriation of payments will not be applied when, from the circumstances surrounding the case, it appears that the application of such rules would work an injustice. Alexander Lumber Co. v. Aetna Acc. & Liability Co., 296 Ill 500, 129 NE 371 (1921).

■ The first-in, first-out principle, is one of the rules of law which determines the ordinary application of voluntary payments or withdrawals when the parties have made no application for themselves and the circumstances of the case do not require a different application. The rule will not be applied where it produces an unjust result. Lowden v. Northwestern Nat. Bank & Trust Co., 84 F2d 847, 851, 852 (CA 8, 1936). Also see: Lincoln Storage Warehouse v. Commissioner of Internal Revenue, 189 F2d 337, 341 (CA 3, 1950) ; Oregon Cedar Products

258

Co. v. Ramos & Kohler, 148 Cal App2d 679, 307 P2d 447, 449 (1957); Hollywood Wholesale Elec. Co. v. John Backin, Inc., 121 Cal App2d 415, 263 P2d 665, 674 (1953); Anderson v. Laurel Oil & Fertilizer Co., 228 Miss 95, 87 So2d 556, 557 (1956); and CJS (Payments) sec 72(b) pp 276, 277.

In our decision of this case, we are in accord with the pronouncement of Mr. Justice Cardozo in the case of Carson et al. v. Federal Reserve Bank of N. Y., 254 NY 218, 172 NE 475, 480, wherein he stated:

> "We have no thought to suggest that this or any other formula as to the application of payments to the items of an account is of such inflexible validity as to admit of no exceptions. Whatever rule is framed will be subordinated to the broader principle that an application, usually appropriate, may be varied by the Court when variance is necessary to promote the ends of justice."

In the case at bar, Kuhn urged the application of the first-in, first-out principle. The defendants have not replied to this contention other than to suggest that during this period in which payments were made to Kuhn there were sums deposited from sources other than Winfield, which funds were only a small fraction of the total deposits and which were used to pay bills other than those of Kuhn. Neither contention is supported by the evidence. There is nothing in the record to indicate to whom, other than Kuhn, the non-Winfield funds were paid or the purpose of such payments. Further, while we are unable to ascertain the full extent of the August 1961 deposits, it is apparent that at least $163,764 of the deposits made during this period, or about 50% of Di Vito's total deposits, were from non-Winfield sources. This is hardly an insignificant portion thereof.

Di Vito and the surety contend that the case of Alexander Lumber Co. v. Aetna Acc. & Liability Co., 296

259

Ill 500, 129 NE 371 (1921) is controlling and decisive in their favor. The Alexander case, at page 503, recognizes at the outset that the " . . . general rule as to the application of payments is that the debtor may specify the account to which he desires application made, and if he does not do so the application which is made by the creditor is binding not only upon the debtor but upon his surety . . . ." The Alexander case further holds that under the provisions of that bond, similar in import and effect to the one before this court, the surety had a special equity in the funds arising from the construction project and that a privity of the contract existed between the surety and the obligee.

The ultimate holding in the Alexander case was, however, based upon the court's specific affirmance of the finding of the master to whom the case had been referred, that payments made to the subcontractor "from the funds arising from the chemistry building were sufficient in amount to discharge the debt due it for materials furnished for said building had such payments been so applied." (p 508.) Such is not the finding in the case at bar. In the Alexander case, the court refused to apply the general rule regarding the application of payments: " . . . when, from all the surrounding circumstances, to do so would work an injustice." (p 506.) The court then concluded at page 506, " . . . the surety . . . has a right to have payments to the material-man from funds derived from the building covered by the surety contract applied to the account for materials furnished for said building."

The contention advanced by Kuhn and the conclusion we reach is not inconsistent with the holding or rationale of the Alexander case. Those funds which could be traced to the Winfield project, were, in fact applied to that account. It is under this theory that $3,000 of the payments received by Kuhn were applied to the Winfield account. In view of the circumstances of this case, the

Alexander case may neither be construed to prohibit Kuhn from applying non-Winfield funds received to antecedent debts nor to hinder Di Vito from directing such application.

Harry W. Kuhn testified that in November of 1961, at Kuhn's office, in the presence of his bookkeeper and himself, Vincent Di Vito, while making a payment on account, stated: "This will straighten it up, everything but Winfield, and you'll have to wait for Winfield until we get the money because we have a problem—we have trouble on the job." This testimony was not denied by Di Vito.

The case of United States for the Use and Benefit of Crane Co. v. Johnson, Smathers & Rollins, 67 F2d 121 (CA 4, 1933), also cited by defendants, is not in conflict with the decision reached here. In that case the court held that it was improper for the materialman to apply to one account, funds which were established to have come from another account and the source of which were known to the materialman; that it was incumbent upon the materialman to establish that the surety had not in fact been harmed by the misapplication of funds; and that the materialman had failed to do so. The issues present in the Johnson case are not at hand in the case at bar. The funds here found to have come from the Winfield project were set off, in their entirety, against the amounts due Kuhn for labor and material furnished thereto.

Under the circumstances of this case, we believe that the judgment of the trial court was proper and fair. Here the Alexander case rule was inapplicable except as to the $3000 of the payments received by Kuhn and applied by him to the Winfield account. Such rule is flexible in its application, dependent upon the facts of the case. The rules of law pertaining to the application of payments are not an end in themselves, but rather are a means to an end—the promotion of intrinsic justice. The rules here applied have accomplished that result.

Accordingly, the judgment of the trial court should be affirmed.

Judgment affirmed.

ABRAHAMSON, P. J. and MORAN, J., concur.