BLACKHAWK PRODUCTION CREDIT ASSOCIATION, Plaintiff-Appellant, *v.* JACK L. BAY *et al.*, Defendants-Appellees.

Second District   No. 78-18

Opinion filed March 16, 1979.

James S. Williams, of Mt. Carroll, for appellant.

Tomas M. Magdich, of Keller & Magdich, and Warren H. Badger, both of Dixon, for appellees.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

Blackhawk Production Credit Association (Blackhawk) appeals from a judgment which confirmed a jury verdict finding the defendant Betty Bay not indebted for various loans and the defendant Jack Bay indebted in the amount of $107,090.60 (which was far less than the creditor claimed). Blackhawk contends that the trial court erred in refusing to direct a verdict in its favor, in failing to direct the manner in which payments were to be credited, and in instructing the jury. Blackhawk also claims that the verdict and judgment are against the manifest weight of the evidence.

Initially Blackhawk filed a complaint and confession on various judgment notes alleged to have been signed by the defendants. Included was a note dated September 14, 1971, in the amount of $528,139.55 together with 24 other notes covering the period from September 27, 1971, to May 30, 1975. Judgment by default was entered against the defendants in the amount of $397,853.85, which reflected $259,674.34 principal indebtedness, $118,996.51 interest, and $19,183 attorney's fees. Subsequently the default judgment was vacated and proofs were presented to a jury.

From the evidence presented at trial it appears that Blackhawk is a farmer-owned cooperative which loans money to farmers on a short and intermediate term basis usually from one to seven years strictly for farming production purposes. The money available for loans is received from the Federal Intermediate Credit Bank. If the farmer has otherwise qualified he must, in order to obtain a loan, make an investment in the Association, which in the case of Blackhawk is a purchase of $5 in stock and a deposit of $5 in a capital reserve account for each $100 borrowed. This could be added to the loan rather than paid in cash and defendant Jack Bay elected to add the payments to his loan account. In the case of the Bays the procedure followed was that they would request a line of credit in an application and if approved the association would take a note for the amount of the application. The member would have that money to draw on for his purchases, usually by a draft written on the association account or in some cases by requesting that the association issue the check. Interest rates were variable and could fluctuate monthly, based on the rates set by the Federal Intermediate Credit Bank with an additional charge determined by the association's board to cover its operating expenses. On some occasions a tentative interest rate was noted on a

promissory note but this was subject to adjustment. Interest accrued only after the drafts were paid. The types of loans were identified in a range from the cipher zero to various numbers, with the higher numbers generally referencing longer maturity dates.

Interest was computed on a daily basis on the outstanding balance. An officer of Blackhawk testified that payments received were applied toward the total line of credit on a specific loan type and not against any one specific note. There was testimony that as of September 11, 1975, the total amount due on all the notes in evidence for principal only was the sum of $249,224.07. (This varied from the $259,674.34 principal alleged in the complaint and confession, which Blackhawk claimed as an error in computation.)

Both of the defendants defended on the theory that Blackhawk's computation of the principal balance did not take into account the proper allocation of payments and credits. In addition, Betty Bay denied signing a number of the notes purporting to bear her signature and also claimed she was being charged with indebtedness where her name did not appear as a maker.

There was testimony that on November 10, 1970, a note for $105,560 bearing the signature of Leslie Bothe, Marian Bothe and the defendants Jack Bay and Betty Bay was made for the purpose of purchasing livestock. This note established a new credit line designated type one. A second note bearing the signatures of Jack and Betty Bay and Leslie Bothe was made on February 9, 1971 for $100,000. Additional notes with the same signatures were made on February 24, 1971, for $40,000, March 17, 1971, for $50,000, April 17, 1971, for $47,000, June 25, 1971, for $18,000. Jack Bay testified that the names of Leslie Bothe and Marian Bothe were not on the notes when he signed them.

Several drafts bearing the signature of Leslie Bothe were drawn against the line of credit represented by the above notes. The name of Jack Bay appears written across several of the drafts but Bay denied ever having placed it there. The drafts totaled $97,630.47. Bay testified that he never had a business relationship with Mr. Bothe nor authorized him to draw against any of his notes.

In the late summer of 1971 the plaintiff requested that Jack Bay consolidate his loans and establish additional credit. A new note was signed for $528,139.55 on September 14, 1971. The application for the loans shows the purpose was renewal of type zero and type three loans for $37,088.18 and $191,051.37 respectively and an additional loan of $300,000. The note bore the signatures of both Jack and Betty Bay.

Subsequent to 1971 the defendants continued to do business with Blackhawk. As one credit line would run out a new application would be made, a note signed and drafts drawn against it. The defendant Betty Bay

testified that she was not actually involved in procuring these loans nor the business of Mr. Bay. She testified that she had never placed her signature on a note which Mr. Bothe had signed. She admitted signing the renewal note dated September 14, 1971, in the amount of $528,139.55 (plaintiff's exhibit No. 13) and then other notes (plaintiff's exhibits Nos. 25, 27, 28, 29, 30, 37, 38, 39 and 41) which totaled $806,114.85. She identified notes on which her signature did not appear totaling $21,061.94. (Plaintiff's exhibits Nos. 40, 42, 43, 44, 45, 46, 47 and 48.) She testified she did not sign or authorize her signature to be placed upon notes where it purported to appear which totaled $375,366.73. (Plaintiff's exhibits Nos. 21, 22, 32-36.) Her husband later admitted that he had placed his wife's name on these notes.

It was stipulated that between September 14, 1971, and August 27, 1975, Mr. Bay paid $1,257,667.98 to Blackhawk. However, the defendants did not designate which notes they intended to pay when they made payments on the loans. The records of Blackhawk also showed that the notes drawn against by Leslie Bothe (type 1) were paid in full on July 13, 1971 (plaintiff's exhibits Nos. 1-6). It appears to be a clear inference from the record, although there is no direct testimony to the effect, that the type 1 notes were paid by being included in the renewal note of September 14, 1971.

Mr. Bay further testified that he was not given a line of credit for $300,000 purportedly included in the September 14, 1971, note and that he understood that the note consolidated all of his debts but did not agree on the figure. He said, however, that he signed in order to keep up his credit with Blackhawk.

Blackhawk first argues that the court erred in failing to grant its motion for a directed finding that there was consideration for the note drawn on September 14, 1971. It argues that the defendants' claim that there was a partial lack of consideration for the $528,000 represented by this note was unsupported. Blackhawk argues in this connection, that the defendants were liable on the note signed by Leslie Bothe because as joint makers they were responsible even if the jury believed that the drafts drawn against them were for Bothe purchases; also, that all of the notes signed by Bothe and drawn upon by the Bothe drafts were paid prior to the time of the consolidated note in September of 1971; and that, in any event, there was sufficient consideration for the September 14, 1971, note in the renewal of the prior notes.

We are not persuaded by Blackhawk's argument that defendants are liable on the notes upon which Leslie Bothe's signature appears no matter who signed the drafts. Both defendants testified that the Bothes' names were not on the instruments when they signed them. Jack Bay testified that he was not in partnership with Bothe and had not authorized Bothe to

write drafts on the account nor had he told anyone at Blackhawk that Bothe could so draw on his account. While Blackhawk's representative testified that he received verbal authorization from Bay, the jury could have believed otherwise on this disputed question of fact.

■■ Since the jury could have found a partial lack of consideration to the extent of the unauthorized drafts it would, to that extent, be a partial defense to the amount claimed. The defense of lack of consideration in whole or in part may be asserted against a holder not having the rights of a holder in due course. (Ill. Rev. Stat. 1977, ch. 26, par. 3—408.) The maker of a note under the Uniform Commercial Code engages to pay according to the tenure of the instrument when he signs or when it is completed according to his authorization (Ill. Rev. Stat. 1977, ch. 26, par. 3—413), but the undertaking does not extend to unauthorized completions. Ill. Rev. Stat. 1977, ch. 26, par. 3—115.

Nor can it be persuasively argued that the Bothe drafts were paid prior to execution of the consolidated note and that this was a basis for a directed verdict in favor of Blackhawk. The trial court was required to view Blackhawk's motion for a directed verdict under the rule of *Pedrick*. (*Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967).) After viewing the evidence in the light most favorable to the defendants it could not be said to so overwhelmingly favor Blackhawk that a directed verdict should have been entered in its favor. We believe the trial court properly concluded that there were sufficient factual matters which the jury should determine in regard to the Bothe drafts and the question of the entire balance due. Plaintiff's records purported to show that $249,647 was due on September 11, 1975, when the suit was filed. From those records there was no way of telling to which note a particular payment was credited. Nor is the consolidation of prior loans in the September 14, 1971, note a reliable starting point. The Bothe loans were marked "Paid by renewal"; and a witness for Blackhawk testified that this was an indication that they were probably paid by a renewal note. The jury could conclude that the Bothe drafts on Bay's account were a part of the principal of the new note and further that this represented unauthorized charges against the Bays. Further, the status of the Bothe-Bay account was clouded by a note dated November 10, 1970, for $405,560 signed by Leslie Bothe, Marian Bothe and the Bays. This note was not part of the type one account on which the disputed Leslie Bothe drafts were drawn. As part of the credit line for the old type one account on which the disputed drafts were drawn, a note for $50,000 signed by the Bays alone was made. Drafts were drawn by Bothe after the $50,000 note was made a part of the type one credit line. In addition Jack Bay testified that at the time he signed the renewal note there was a dispute as to the amount owing.

■ Therefore, the jury could have found less than full consideration for the loans and the trial court properly refused to direct a verdict.

*First National Bank v. Achilli*, 14 Ill. App. 3d 1 (1973), cited by Blackhawk is distinguishable on its facts. In *Achilli*, we held that consideration for a negotiable instrument is presumed and that the burden is on the person charged to show lack of consideration by certain and unambiguous evidence. (14 Ill. App. 3d 1, 6.) There, however, the lower court found that there was sufficient consideration in the execution of the note as security for antecedent debt and in addition the record showed that Achilli had continued to run the business and had filed a claim against the estate of the maker of the former note for the total amount of that note. Here, as we have noted, the jury could have found partial failure of consideration for the renewal note.

■■ The trial court over Blackhawk's objection gave an instruction tendered by the defendant Betty Bay. (Instruction No. 7.) Essentially the instruction stated that Blackhawk had the burden of proving that the notes were executed by Jack Bay and Betty Bay for value received, the defendants had the burden of proving that the September 14, 1971, note for $528,000 was partially without value received by reason of the Leslie Bothe drafts and that Betty Bay must prove that she did not execute those notes on which she claims her signature was forged and further that her signature did not appear on another group of notes. Blackhawk argues that the trial court erred in giving the instruction and principally bases its objection on its claim that no jury issue was presented with respect to the drafts drawn by Leslie J. Bothe. However, as we have previously indicated there was a disputed fact issue as to whether the September 14, 1971, note lacked partial consideration. The instruction properly placed the burden of proving each one of their affirmative defenses upon the defendants. (See *Foos v. Sabin*, 84 Ill. 564, 568 (1877).) It therefore appears that since there was a jury fact question as to whether there was full consideration for the $528,000 note, there was no error in submitting the question to the jury under the instruction.

Blackhawk has also argued that the question of how the payments should have been applied and apportioned should have been determined by the court and not have been given to the jury. Blackhawk relies principally on our decision in *Village of Winfield v. Reliance Insurance Co.*, 64 Ill. App. 2d 253, 258 (1965), which approved the rule:

> " 'Where a debtor makes a payment to his creditor, to whom he is indebted on several accounts, he has the right to indicate upon which item the payment shall apply. If he does not do so, the creditor may ordinarily select the item, and if no selection is indicated by either, the law will apply the payment as may seem

reasonable and just. And in such cases the application will ordinarily be made upon the item first due. Lowry v. Gear, 32 Ill. 382; Bayley v. Wyncoop, 5 Gil 459; Sprague v. Hazenwinkle, 53 Ill. 419; Bonnel v. Wieder, 67 Ill. 327.' "

Blackhawk interprets the phrase "the law will apply the payment" as meaning that the trial judge should determine the allocations as a matter of law. We disagree with this interpretation.

■■ The cases cited by the court for that rule (*Lowery v. Gear*, 32 Ill. 383, 386-87 (1863); *Bayley v. Wynkoop*, 10 Ill. 449, 453 (1849); *Sprague, Warner & Co. v. Hazenwinkle*, 53 Ill. 419, 423 (1870); *Bonnell v. Wilder*, 67 Ill. 327, 332-33 (1873)) in fact involve submission of the issue of just and equitable apportionment of payments to juries. And in *Winfield* while there is no indication whether the case was tried before a jury, the language of the opinion is in the context of a case in equity without a jury. (64 Ill. App. 2d 253, 258.) It was therefore proper for the trial court to submit the question of the allocation to a jury.

■■ The instruction submitted was in accordance with the well-established rule that where the debtor makes no direction as to the application of a payment and no application is made by a creditor the payment must be applied most advantageously to the creditor if the application of the rule will not work an injustice. See *Village of Winfield v. Reliance Insurance Co.*, 64 Ill. App. 2d 253, 258 (1965).

■■ We also conclude that the verdict was not against the manifest weight of the evidence. The evidence indicated that there were two payments received after September 14, 1971, the date of the $528,000 renewal note. Defendants argue that these two payments should have been credited against the September 14 note while the plaintiff argues that the September 16 payments were just late bookkeeping entries properly credited to notes due before the consolidation note. Since only a general verdict was requested and given there is no way to ascertain with certainty whether or not the jury deducted the amount of the two disputed payments from the note sued upon. Evidence of how the payments were applied was in dispute. The defendant Jack Bay testified that all notes were to be consolidated in the $528,139.55; while representatives of Blackhawk testified that type two and seven notes were not consolidated. The plaintiff's representatives testified that the amount of the disputed payments, $208,274.27 and $78,117.63 were properly credited against type two and seven loans. Another witness for the plaintiff, however, admitted that there was only one type of loan after September 14, 1971.

Blackhawk also argues that the rate of interest changed on the notes was never in dispute and that the jury could not have found rates on particular notes other than those testified to by plaintiff's witnesses. Blackhawk's records reflected a rate of 8⅞% interest when in fact there was

no evidence introduced to show that a rate different than that was in fact charged. However, it was impossible to ascertain what interest rate the jury applied against the notes since several accounting errors both in the original complaint and in the interrogatories were brought out by the defendants on cross-examination of Blackhawk's witnesses. In addition Jack Bay had testified that Blackhawk had agreed to stop charging interest if he would liquidate his holdings and pay the principal. This was denied by Blackhawk, but the jury could reasonably have believed that the defendant agreed to undergo an immediate liquidation of his substantial land holdings in order to pay the debt and that Blackhawk in consideration of his offer agreed to stop the interest from accruing against his loan. This theory is further supported by the testimony of plaintiff's witness that the St. Louis office considered the Bay loans a "lost loan." If the jury so decided the evidence in favor of the Bays, the consideration for the modification of the contract as to interest could be found in the benefit accruing to the promisor or the loss or detriment to the promisee. (See *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 330 (1977).) While the exact computation of the jury cannot be found from the general verdict we must apply the rule that a court of review should not disturb a verdict unless it is clearly wrong or the court is satisfied that it is against the manifest weight of the evidence and that an opposite conclusion is clearly evident. (*Tuskey v. Callos*, 112 Ill. App. 2d 213, 216 (1969).) Under the conflicting evidence we will not disturb the verdict as to Jack Bay.

■■ Similarly, as to the finding that Betty Bay was not liable on any of the notes we find substantial evidence to support the jury's verdict. The total amount of the allegedly forged notes was $375,366.73. The testimony showed that total payments made exceeded the amount of the notes which she admittedly signed, by over $400,000. If therefore the jury apportioned payments first against those notes upon which her valid signature appeared it could reasonably have concluded that she was not liable for any further amounts to the plaintiff.

We therefore affirm the judgment.

Affirmed.

GUILD, P. J., and RECHENMACHER, J., concur.