GRAYBAR ELECTRIC COMPANY, INC., Plaintiff-Appellee, *v.* McCOY CONSTRUCTION COMPANY, a/k/a Jean A. McCoy & Sons, Inc., *et al.*, Defendants-Appellants.

Third District   No. 3—83—0414

Opinion filed April 19, 1984.—Rehearing denied June 6, 1984.

HEIPLE, J., dissenting.

Paul E. Root and Roger B. Gomien, both of Gomien, Root & Masching, of Morris, for appellants.

Robert W. Scott, of Swain, Johnson & Gard, of Peoria, for appellee.

PRESIDING JUSTICE STOUDER delivered the opinion of the court:

This action was commenced by Graybar Electric Company, Inc. (Graybar), against McCoy Construction Company (McCoy) and Fidelity and Deposit Company of Maryland (Fidelity) on a commercial surety bond relating to a construction project for the Covenant Children's Home in Princeton, Illinois. The circuit court of Bureau County entered judgment in favor of Graybar and against Fidelity in the amount of $21,019.65. Fidelity has appealed from this judgment. Graybar has also cross-appealed, arguing the trial court erroneously reduced its claim by $1,885 and erroneously declined to award contract interest.

As a condition of the Covenant Children's Home construction project, McCoy was required to provide the commercial surety bond which is the subject of this litigation. The bond executed by Fidelity provided in the usual terms for indemnification of those supplying material and labor on the project. McCoy subcontracted a portion of the work to Grawey Electric Company, and in turn Grawey Electric Company (Grawey) purchased electrical supplies from Graybar. After the project was completed Graybar claimed it had not been paid in full by

Grawey, so this action was commenced on the bond.

From the evidence, it appears during the period from July 1980 to May 1981 Graybar supplied materials for the Covenant project to Grawey amounting to some $62,000. During the same period McCoy paid Grawey some $112,000 and the subcontractor paid the supplier some $115,000. However, the supplier applied only $36,000 to the Covenant project, leaving a balance due thereon of $26,000. The balance of the $115,000 received from Grawey by the supplier was allocated to other accounts which Grawey owed the supplier. According to Graybar, this allocation was made pursuant to the direction of Grawey.

On this appeal the surety phrases the issues as follows:

I. Did the plaintiff satisfy the necessary conditions precedent to recover under the bond?

II. Was the finding of the trial court that Grawey Electric, Inc. (Grawey), directed the application of funds paid by it to the plaintiff against the manifest weight of the evidence?

III. Was the decision of the trial court that the surety did not have special equities in the funds paid by Grawey to the plaintiff against the manifest weight of the evidence?

■ Fidelity's first contention is that Graybar failed to satisfy a condition precedent of the language of the bond itself, the condition precedent being that notice of nonpayment be sent by registered mail. While we acknowledge that this technicality could have been a possible defense, it is not available in this case. It is not available because Fidelity, while desirous of following the technicalities of its bond, failed to follow the technicalities of Illinois pleading and practice. In its complaint, Graybar alleged generally that it had performed all conditions precedent. Fidelity entered a general denial to this allegation. Supreme Court Rule 133 required Fidelity to allege facts "in connection with the denial showing wherein there was a failure to perform." (87 Ill. 2d R. 133(c).) Fidelity waived the claim of nonperformance of this condition precedent by failing to specifically plead.

Next we turn to the merits of the surety's appeal. In summary, the surety's objections to the trial court's judgment are twofold. First, it argues there is insufficient competent evidence to support the claim by Graybar as approved by the trial court of the allocations of payments by Graybar pursuant to Grawey's directions. Second, the surety argues even if the directions by Grawey were supported by competent evidence, the special equitable interest in the funds from the Covenant project traceable through Grawey to Graybar required the allocation of such funds to the payment for material supplied for the Covenant project.

The major premise of the surety's argument is that it has a special equitable interest in the funds received by Graybar from Grawey because they are traceable from the Covenant project for which the material was supplied. In response, Graybar argues the evidence is insufficient to support any claim of special equitable interest in the funds but even if so the direction of the subcontractor to apply funds to nonproject accounts was both properly proved and legally authorized.

If the surety did not establish its special equitable interest in the funds, it would follow that whether funds received by the supplier were or were not properly allocated would be immaterial since the surety would have no interest in such funds. This is one of the teachings of *Alexander Lumber Co. v. Aetna Accident & Liability Co.* (1921), 296 Ill. 500, 129 N.E. 871, which makes the special equity of the surety dependent upon proof that the funds received by the creditor were derived from the construction contract. According to the court in *Alexander Lumber Co.*:

> "Without reviewing in detail here the mass of evidence and accounts in the records, we are of the opinion that the weight of the evidence supports the master's finding regarding the source of the funds paid to defendant in error by Freeman & Brooks. The tracing of certain moneys and payments in the evidence, together with the testimony of Thomas Evans, a public accountant, and others, produces the unavoidable conclusion that payments to the amount of defendant in error's claim for materials furnished for the chemistry building were, in fact, made from funds arising from that building." (296 Ill. 500, 508.)

In fact the opinion in *Alexander Lumber Co.* indicates the creditor in that case, unlike the creditor in the instant case, did not dispute the source of the funds which it received.

■■ As indicated earlier, the only evidence relating to derivation or source of funds received by Graybar was testimony of the payments made by McCoy from the Covenant project to Grawey during the 10-month period in question totalling $112,000 and the receipts by Graybar from Grawey during the same period totalling $115,000. We fail to see how such evidence supports the conclusion the funds received by Graybar were those derived from the Covenant project contract thereby creating in the surety a special equity in such funds. Based on such evidence, it is just as reasonable to conclude that the payments by McCoy from the Covenant construction project to Grawey were paid to other Grawey creditors or dissipated in other ways. Equally reasonable is the conclusion that the funds received by Gray-

bar were from other projects of Grawey. Neither books, records nor bank accounts of Grawey were presented for consideration by the trial court.

In *Village of Winfield v. Reliance Insurance Co.* (1965), 64 Ill. App. 2d 253, 212 N.E.2d 10, the court deals at length with a method which it approves based on an accounting analysis for tracing funds derived from a construction project when payments are made therefrom as well as from other funds received from nonproject sources. No such evidence was presented in the instant case, and any conclusions based on the source of the funds are purely speculative.

Although the surety claims his special equity was proved merely because the subcontractor received more money from McCoy than it paid to Graybar, a conclusion which we have rejected, the surety also insists that it was the duty of Graybar, the creditor, to establish that the funds were not derived from the construction contract rather than its burden to establish the converse. No authority has been cited for this proposition, and we believe the surety's position is without merit. The surety is in the position of asserting rights based on its special equity in the funds, which is in its nature an equitable defense of payment. Absent the special equities, the usual rules of payment by debtors are applicable and the surety would have no basis for asserting that a special equitable rule should be applied to avoid injustice. Thus, where the creditor initially proves the terms of the surety bond, the supplying of the materials and their incorporation into the building project covered by the bond and the nonpayment therefore, it is the burden of the surety to show that the obligation was paid or otherwise discharged. This is in the nature of an affirmative defense whether so pleaded or not, and where the rights of the parties depend upon a special relationship to the transaction, it should be the burden of the party claiming such special relationship to establish it.

■■ Since we believe that the evidence as a matter of law fails to establish the funds received by the plaintiff were derived from the Covenant construction project, we hold the defendant surety has no special equity in such funds and is in no position to complain that any of the funds received by the plaintiff were allocated to other accounts of Grawey. For this reason we find it unnecessary to decide whether the allocation of the funds to other accounts was supported by proper evidence or was legally permissible.

■■ On its cross-appeal Graybar argues the trial court erred in reducing its claim by $1,885 and by failing to award it contract interest. Apparently, the trial court believed that $1,885 of the $115,000 which Graybar received from Grawey was not allocated to either the Cove-

nant construction project material account or to any other accounts, and accordingly it credited the amount to the Covenant project account. Both parties seem to agree that the evidence does not support this deduction even under the theory applied by the trial court. Both because of such error and because of our position on the appeal of the surety, we conclude the deduction of $1,885 was erroneous. So far as the other objection of Graybar is concerned, we believe the court properly held that Graybar was entitled only to interest provided by statute and not the monthly rate of interest proclaimed on its monthly statements, and, accordingly, we find no error in the trial court's decision disallowing interest at the contract rate.

For the foregoing reasons, the judgment of the circuit court of Bureau County is modified by adding to it the amount of $1,885 erroneously disallowed by the court, and the judgment as so modified in favor of the plaintiff in the amount of $22,904.65 with interest at 5% is affirmed.

Judgment modified and as modified affirmed.

SCOTT, J., concurs.

JUSTICE HEIPLE, dissenting:

This case is a suit on a commercial bond. The suit was brought by an electrical parts supplier against the surety company for an alleged partial nonpayment to them by an electrical subcontractor on a construction project. McCoy Construction Company (McCoy) was the general contractor. Grawey Electric Company (Grawey) was the subcontractor. Fidelity and Deposit Company of Maryland (Fidelity) was the commercial surety company.

The time frame for this controversy was from July 1980 to May 1981, some 10 months. During this time, the supplier furnished some $62,000 worth of materials to the subcontractor for this project. For work performed, the contractor paid the subcontractor some $112,000, and the subcontractor paid the supplier some $115,000. On the surface, it would at first appear that the supplier had been paid in full, heaped and rounded measure. Where is the controversy?

The controversy arises because the subcontractor, Grawey, was also buying materials from the supplier, Graybar, for other unrelated jobs. When payments were made from Grawey to Graybar, Graybar did not credit all payments just to this particular project. Not at all. Some of these payments were also credited to various other projects wherein Grawey was buying electrical supplies from Graybar. Indeed,

of the $115,000 paid by Grawey to Graybar, Graybar allocated only $36,000 to the McCoy project. Thus, Graybar claimed a balance due on the McCoy project of $26,000 ($62,000 supplied, less credits of $36,000) and asked for a judgment against Fidelity in that amount.

Upon a trial being held, the trial court awarded a judgment to Graybar in the amount of some $21,000. Fidelity appeals and Graybar cross-appeals.

At trial, Fidelity argued that Graybar had no right to allocate Grawey's payments in the manner that was done; that the $26,000 claimed by Graybar was in fact satisfied by McCoy's payments to Grawey of $112,000 and by Grawey's payments of $115,000 to Graybar which amply exceeded Graybar's total materials bill on the McCoy project of $62,000.

Our supreme court pronounced the law applicable to this situation in the case of *Alexander Lumber Co. v. Aetna Accident & Liability Co.* (1921), 296 Ill. 500. I restate it as follows. A surety has a special equity interest in funds paid by a contractor to a subcontractor (the debtor), which funds are in turn used by the subcontractor to pay its supplier (the creditor). This special equity requires the creditor to apply the funds paid by the debtor to the account of the contractor which is covered by the bond. This special equity will arise when payments are made and the debtor fails to designate the accounts on which payments are to be applied. Absent such designation of accounts, they will be deemed to be credited against the specific project for which the bond was issued. That is the law.

On the other hand, if the debtor does, in fact, direct the creditor to allocate payments among various accounts, that direction is controlling and the special equity of the surety does not arise. Where the debtor prefers other accounts with the same creditor, the court must consider that this is just as much a default (so far as the bond is concerned) as if the debtor had spent the money elsewhere.

In the instant case, and upon hearing the evidence, the trial court's judgment of some $21,000 was grounded on the premise that all but some $2,000 paid by Grawey to Graybar was directed by Grawey, thus bringing the surety bond into play. That is to say, the trial judge found Grawey to be in default to Graybar on the McCoy project to the extent of $21,000.

The question is, did Graybar successfully prove that Grawey had directed payments to other accounts? Graybar's exhibit No. 9 is a group exhibit consisting of copies of Graybar invoices billed to Grawey. The foundation for this exhibit was laid by Mr. Abel, a credit manager of Graybar, who testified that the invoices in this exhibit

were sent by Graybar to Grawey. The invoices were later returned to Graybar along with checks from Grawey. The invoices listed bills for materials for several different accounts. The checks did not always cover the entire bill. Abel stated that an employee of Grawey, named Mr. Collins, directed payment among the accounts by placing check marks next to the particular items to be paid with the check.

Scrutiny of this evidence reveals that it is flawed. First of all, the invoices offered are not the original invoices. They are copies. Moreover, the invoices in the exhibit are not even copies of the original invoices *returned* by Grawey, which supposedly carry check marks; rather, the invoices are copies of copies of the invoices *sent out* by Graybar. This is a violation of the best evidence rule which requires that the original writing be introduced into evidence unless the original is shown to be lost, destroyed or unavailable. In such a case, the proponent must prove the prior existence of the original, its unavailability, the authenticity of the substitute and the proponent's own diligence in attempting to procure the original. Graybar should have had in its possession the original check-marked invoices returned by Grawey. Yet, Graybar never attempted to introduce the original invoices and never explained their unavailability. The admission of this group exhibit into evidence was error.

Moreover, Mr. Abel's testimony did not and could not lay the proper foundation to bring the subject of the check marks on the invoices into evidence. His testimony was clearly hearsay. Although Abel stated that an employee of Grawey named Mr. Collins had directed payment among the accounts by placing check marks next to the particular items to be paid, Abel stated that he never discussed the meaning of the check marks with Mr. Collins, and Abel further admitted that he had no idea who, at Grawey, made the check marks or sent the invoices back to Graybar. Thus, the incompetence of this evidence is doubly manifest.

On another specific item, Mr. Abel also testified that Mr. Collins hand delivered a sealed envelope to Abel. The envelope contained a $15,000 check. Abel further related that Collins had told him the check was part payment for the material used in the K-mart job (a different job than the McCoy project). This, too, was incompetent. No competent witness testified to Collins' position and authority to direct payment for Grawey.

This case should be reversed. The majority, however, declines to do so, finding that the funds were not traced through from the contractor to the subcontractor to the supplier. This is error. The evidence before the trial court was that the supplier furnished some

894

$62,000 worth of materials to the subcontractor for the project. Further, that the contractor paid the subcontractor some $112,000 and that the subcontractor paid the supplier some $115,000. That is sufficient *prima facie* tracing. There was no other evidence. All else is conjecture. While other evidence might have been introduced to show that the money came from here or there and went elsewhere, there was no such evidence. On the evidence before it, sketchy as it was, the trial court was entitled to conclude *prima facie* that Graybar received ample money from the subject project to be fully paid. That established the special equity of Fidelity in those funds. The question remaining was whether, under the evidence, Graybar had properly allocated those funds to other accounts. As already indicated, I believe the evidence on that point was deficient. Thus, I dissent.