In the Matter of MOUNT CALVARY BAPTIST CHURCH also known as Mount Calvary Baptist Church & School, Debtor.

**CHURCH MUTUAL INSURANCE COMPANY, Plaintiff–Appellee,**

v.

**MOUNT CALVARY BAPTIST CHURCH also known as Mount Calvary Baptist Church & School and Seaway National Bank, Defendants–Appellants.**

Nos. 94–3521, 94–3574.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 8, 1995.

Decided Nov. 13, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 2, 1996.

Scott W. Hoyne, Johnson & Bell, Chicago, IL, Alan G. Gregory (argued), Troy, MI, for Church Mutual Insurance Company.

Sharon Goss, Arlene Y. Coleman–Romeo (argued), Witwer, Poltrock & Giampietro, Chicago, IL, Denise Brewer (argued), Brewer & Associates, Chicago, IL, for Mount Calvary Baptist Church.

Alan W. Brothers, Robin D. Shoffner, Carney & Brothers, Chicago, IL, for Seaway National Bank.

Before BAUER, COFFEY, and EVANS, Circuit Judges.

**52**

EVANS, Circuit Judge.

This case boils down to one question: Should the Church Mutual Insurance Company be allowed to cash a check intended to cover premiums due on three specifically identified insurance policies and apply the proceeds not to the policies but to other debts of the insured? The bankruptcy court said no; the district court, on review, said yes. We think the bankruptcy court got the right answer so we reverse the decision of the district court and remand for the entry of judgment in favor of Mount Calvary Baptist Church and its mortgagee, the Seaway National Bank.

A fire destroyed the Mount Calvary Baptist Church on September 11, 1989. A week later the church filed for relief under Chapter 11 of the United States Bankruptcy Code. Two months later, in November of 1989, the Church Mutual Insurance Company, which had been providing several types of insurance to Mount Calvary, filed this case in the United States District Court for the Northern District of Illinois, seeking a declaratory judgment that a multi-peril insurance policy previously issued to the church was not in effect when the blaze ignited.

Church Mutual's suit for declaratory relief was referred to the bankruptcy court. Bankruptcy Judge David H. Coar[1] conducted a trial in the case during September of 1993. In a decision entered on December 29, 1993, Judge Coar concluded that the multi-peril policy was in force at the time of the fire. The matter was then ready to move to the district court for further proceedings.

■ Church Mutual's declaratory judgment action was, the parties agreed, referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a). The parties seemed to have disagreed, however, as to whether Judge Coar's decision was made pursuant to 28 U.S.C. § 157(b)(1), in which case he was issuing a final order, or whether his decision was in the nature of proposed findings of fact and conclusions of law, the scheme announced in § 157(c)(1).

In the former case, a district court's review of a decision by a bankruptcy judge

would have been pursuant to Bankruptcy Rule 8013. That rule provides in part that upon appeal to the district court, the "[f]indings of fact [of the bankruptcy court], whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous. . . ." In the latter case—if the decision was made pursuant to § 157(c)(1)—review would be under Bankruptcy Rule 9033. Rule 9033 provides that the bankruptcy judge makes "proposed findings of fact and conclusions of law" and that the district judge then makes a "de novo review upon the record or, after additional evidence, of any portion of the bankruptcy judge's findings of fact or conclusions of law to which specific written objection has been made. . . ."

How was Judge Coar proceeding? His decision was framed as "proposed findings of fact and conclusions of law"—a point for Church Mutual—but his conclusion read more like a final order—a counterpoint for Mount Calvary. Mount Calvary, the winner in the bankruptcy court, wanted Judge Coar's findings of fact upheld unless they were clearly erroneous. Church Mutual thought otherwise; de novo review in the district court was required.

To determine just how Judge Coar was proceeding, Church Mutual filed a motion under 28 U.S.C. § 157(b)(3) seeking clarification in the bankruptcy court. Judge Coar revisited the matter in a short order issued on January 13, 1994. In his encore, Judge Coar quickly got to the core of the matter, noting that the proceeding before him was non-core and that further proceedings in the district court would be under Bankruptcy Rule 9033.

After the clarification order was issued, the case moved to the district court, where objections by Church Mutual to Judge Coar's proposed findings were entertained. The district court, proceeding de novo under rule 9033, adopted Church Mutual's view of the case, holding that the multi-peril policy was not in effect at the time of the fire. This appeal by Mount Calvary followed.

On appeal to this court, Mount Calvary again argues that the district court was obli-

---

1. Judge Coar is now a United States district judge for the Northern District of Illinois.

gated to review Judge Coar's findings under a clearly erroneous standard. Mount Calvary even adds a new wrinkle to its argument, contending that Church Mutual consented to the bankruptcy court's consideration of the case under § 157(c)(2). Consent under that section would, like a proceeding under § 157(b)(1), obligate the district court to review the bankruptcy court findings under a deferential "clearly erroneous" standard.

We agree with Church Mutual and the judges below on the standard of review. Judge Coar acted under § 157(c)(1). Church Mutual, by mere silence, did not consent to proceed in the bankruptcy court under § 157(c)(2). *See Home Insurance Co. v. Cooper & Cooper, Ltd.,* 889 F.2d 746 (7th Cir. 1989). The district court properly reviewed the case de novo, and its findings of fact can be disturbed only if they are clearly erroneous. *Anderson v. City of Bessemer,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

It does not inexorably follow, however, that Church Mutual gets the brass ring at the end of the ride. It doesn't, for we review the district court's conclusions of law de novo. *BASF Corp. v. Old World Trading Co.,* 41 F.3d 1081 (7th Cir.1994). And in this case, it is a conclusion of law with which we disagree.

■ For several years prior to 1989, Church Mutual and Mount Calvary, a Baptist church and school on Chicago's south side, did business together. Church Mutual issued at least six policies of insurance to Mount Calvary over the years. The particular policy at issue in this case is a multi-peril contract of insurance—number 061970–02–49653—issued to Mount Calvary on December 7, 1987. Of the policies issued by Church Mutual, Mount Calvary considered the multi-peril to be the most important. The Seaway National Bank is named as the mortgagee under the policy.

Two months before the fire, on July 5, 1989, Church Mutual mailed notices of cancellation to Mount Calvary on its business automobile and workers compensation policies. The cancellation notices were based on Mount Calvary's failure to pay premiums on those policies in a timely manner. On July 10, 1989, Church Mutual sent a similar cancellation notice to Mount Calvary on the multi-peril policy. The cancellation notices provided that the business automobile policy would be cancelled on July 17, 1989; the workers compensation policy on July 17, 1989; and the multi-peril policy on July 22, 1989. Form letters which accompanied the notices with the salutation "Dear Policyholder" gave the amount of the premium past due and provided that payment must be received within 10 days from the date of the notice or each policy would be cancelled. The letters from Church Mutual also contained the following statement, with the precise sum due inserted in bold type:

> Please send us a BANK MONEY ORDER or CASHIER'S CHECK for $_____ and keep your protection uninterrupted. Uncertified personal checks will *not* be accepted.

The letters indicated that the amounts due were $147.25 for the automobile policy; $932.50 for the workers compensation policy; and $292.75 for the multi-peril policy. The three sums total $1,372.50.

At the time the cancellation notices were received, Willie Barron was the financial secretary of Mount Calvary. It was his job to pay the bills. On July 13, 1989, just three days after Church Mutual sent the cancellation notice on the multi-peril policy and nine days before the cancellation was to become effective, Mr. Barron wrote a check on Mount Calvary's regular business checking account to Church Mutual for the exact sum of the past due premiums on the three identified policies. The check totaled $1,372.50. He placed the check and the three cancellation notices—which identified each policy by its unique number—in an envelope and mailed them to Church Mutual. Church Mutual received the payment on July 18, 1989, and the check was deposited to Church Mutual's bank account that day. The check cleared without a hitch.

During the relevant time, Sharon Kleinschmidt was the billing accounts receivable supervisor for Church Mutual. She maintained at trial that she did not see the notices which Mr. Barron had included with the payment, a claim rejected by both the bankruptcy court

and the district court. Ms. Kleinschmidt made a decision to apply the $1,372.50 to cover amounts Mount Calvary owed Church Mutual for "earned premiums due" rather than on the three specific policies involved in the July cancellation notices. In her July 18, 1989, letter of explanation, she wrote:

> Mount Calvary Baptist Church and School
> 1257 West 111th Street
> Chicago, IL 60643
>
> RE: Commercial Fire Policy No. 061970–13–564633
>
> The policy indicated above was cancelled because the premium was not paid on time. Your payment which we just received arrived too late for us to reinstate this cancelled policy.
>
> We are cashing your check and deducting that amount from the earned premium due on the above captioned policy, as well as any premiums due from other policies that you may have with our company.

| | | |
|---|---|---|
| $ | 285.00 | Earned premium due on the above captioned policy |
| + | 292.75 | Premium due on multi-peril policy No. 061970–02–496353 |
| + | 2,610.75 | Premium due on workers' compensation policy No. 061970–07–500295 |
| + | 932.50 | Premium due on workers' compensation policy No. 061970–07–557465 |
| + | 2,122.00 | Premium due on automobile policy No. 061970–09–502786 |
| + | 147.25 | Premium due on automobile policy No. 06190–09–557465 |
| − | 1,372.50 | Your check amount |
| $ | 5,017.75 | Balance due on account immediately |

> Should you have any questions on the above, please feel free to contact me.

When he received the letter, Mr. Barron called Ms. Kleinschmidt to protest the application of the payment. She told him nothing could be done to change the situation. During August, Mr. Barron made additional telephone calls to protest the application of the payment. His attempts were futile: he was told that the policies were cancelled, including the multi-peril policy at issue here.

The primary reason Mr. Barron did not prevail was that Church Mutual had an internal procedure under which payments received without direction on how they should be applied were applied first to unpaid earned premiums. Ms. Kleinschmidt said that because she did not see the cancellation notices, she followed the company procedure. She followed the procedure, in fact, even though it should have been clear to her that the amount tendered was the precise sum stated to be due in cancellation notices on three specific policies.

In addition, Church Mutual relies on another procedure of the company, i.e., that payments, which are made to reinstate policies after cancellation notices are sent, must be in the form of money orders or cashier's checks unless two narrow exceptions, not relevant here, apply. As a result of all this, Church Mutual took the position that the multi-peril policy was not in effect when the church burned down on September 11.

The courts below analyzed the issue presented in terms of contract law, finding that Mount Calvary did not accept Church Mutual's offer as set out in the notice of cancellation for the multi-peril policy. Mount Calvary did not send a money order or cashier's check. The courts found that by sending one uncertified check on the church's account to cover three premiums, Mount Calvary made a counteroffer. The bankruptcy court found that in cashing the check and depositing it in its own account, Church Mutual accepted the counteroffer. Because debtors have a right to direct their creditors as to which accounts they wish to pay, the bankruptcy court found that Mount Calvary had a right to direct payment to the three policies, including the multi-peril policy.

The district court disagreed with the bankruptcy court in one important regard. It concluded that Mount Calvary could not reasonably have interpreted Church Mutual's conduct as an acceptance of its counteroffer. Apparently finding Ms. Kleinschmidt's letter of July 18 considerably clearer than we do, the court determined that it was a rejection of the counteroffer. Because the court found that the intent to reject the counteroffer was clear, it concluded that the general rule that a debtor can direct where payment should go does not apply.

It is this final conclusion with which we disagree. We see nothing in the facts of this case to indicate that the general rule of Illinois law—that a debtor retains the right

to direct where his payment goes—should not apply.

The law is clear on this issue. In *Alexander Lumber Co. v. Aetna Accident & Liability Co.*, 296 Ill. 500, 503, 129 N.E. 871 (1921), the court recognized that the "general rule as to the application of payments is that the debtor may specify the account to which he desires application made. . . ." *See also Village of Winfield v. Reliance Insurance Co.*, 64 Ill.App.2d 253, 212 N.E.2d 10 (1965). By cashing the check, we conclude that Church Mutual accepted the payment. Even under circumstances much more egregious than this, the cashing of a past-due premium check was held to be acceptance of the payment. *See Van Hulle v. State Farm Mutual Automobile Ins. Co.*, 44 Ill.2d 227, 254 N.E.2d 457 (1969). *Sementa v. Tylman*, 230 Ill.App.3d 701, 172 Ill.Dec. 327, 595 N.E.2d 688 (Ill.App.1992), mentioned by the district court as an exception to the rule, involved a dispute between two dentists arising from the sale of a dental practice; it is unpersuasive as authority for looking past the established law of Illinois. In this case, involving an insurer and its insured, with all its attendant fiduciary responsibilities and public policy considerations, the general law of Illinois applies.

In fact, Church Mutual concedes the point that under ordinary circumstances, "Mount Calvary, as a debtor, may have the right to designate which of its debts will be paid with a tendered check. . . ." The company goes on to say, however, that Mount Calvary's status as a debtor does not give it the right to compel Church Mutual to accept a tendered check as legal consideration to form a separate contract. Or as Church Mutual's lawyer said in his opening statement in the bankruptcy court:

> [W]hat Mount Calvary was trying to do was to jam its payment down Church Mutual's throat to get them to do something they never agreed to do.

That observation in the bankruptcy court was a bit of an overstatement. Church Mutual invited Mount Calvary to submit a premium payment. In making the payment, Mr. Barron was hardly jamming anything down the company's throat. It is true that he did not follow the company's instructions to the letter. He did not send the right kind of check. But under the unique facts of this case, that is at best a minor detail.

What we have here is a routine payment of a past-due premium by an insured to an insurance company with which it had previously done business. It seems unlikely that Mr. Barron had the concepts of Samuel Williston or Arthur Corbin in mind when he paid the bill. He did not intend to do anything as formal as present a counteroffer when he submitted the payment in a form that differed slightly from what the company requested. He was just paying the bills. But whatever was happening, if the insurance company did not like the check, it should have returned it and asked for a cashier's check or money order. It did not do that. Instead, it cashed the check, and the check was as good as gold.

But after accepting the money, the company applied the payment without regard to Mount Calvary's wishes. As an explanation for the company's action, Ms. Kleinschmidt wrote the July 18 letter. By its own terms, the letter refers only to the "policy indicated above," which is the commercial fire policy. The payment, she said, arrived too late to reinstate the fire insurance policy so the company was applying the proceeds of the check elsewhere. The letter shows that somehow Ms. Kleinschmidt had the idea that Mr. Barron intended the payment to go in part to the fire policy—why else did she tell him it hadn't? In fact, the district court found that "Kleinschmidt did in fact see these cancellation notices accompanying Mount Calvary's July 13, 1989 check" and that she must have known or suspected what Mr. Barron intended.

Both courts below believed Mr. Barron's testimony that he inserted the specific cancellation notices for the three policies into the envelope with the check for $1,372.50. That Ms. Kleinschmidt said she did not see the notices is not controlling. Mount Calvary directed where the payment should go. In addition, Mr. Barron objected two or three times to the misapplication of the funds. His intention as to where the money should go was crystal clear. Nothing in Illinois law

gave Church Mutual the right to cash the check and apply the proceeds to other purposes.

For these reasons, the judgment below is REVERSED and the case REMANDED for the entry of a judgment noting that the multi-peril insurance policy was in effect on the day of the fire.