PETERSON BANK, Plaintiff-Appellant and Cross-Appellee, v. SHELDON
P. LANGENDORF *et al.*, Defendants-Appellees and Cross-Appellants.

First District (5th Division)   No. 84—2369

Opinion filed August 9, 1985.—Rehearing denied October 10, 1985.

George B. Collins, of Collins & Uscian, of Chicago, for appellant.

Howard D. Hollander, Richard J. Hollander, and Gary P. Hollander, all of Hollander & Hollander, of Chicago, for appellees.

JUSTICE SULLIVAN delivered the opinion of the court:

This is an appeal by Peterson Bank (the bank), from an order entered at the close of its case during trial granting defendants' motion for a directed finding and dismissing the bank's mortgage foreclosure action. It is contended here that reversal is required because the trial court decision was based on the erroneous finding that the mortgage lacked consideration.

On December 4, 1979, defendants went to the bank to borrow money to enable them to purchase an insurance company. By signing a mortgage on their house and a note for $100,000 they obtained a line of credit in that amount. The mortgage and note were signed by both defendants, and later that same day Sheldon executed a promissory note for $75,000, receiving therefor a cashier's check which he negotiated. This note stated that it was secured by certain securities[1] and by the "Mortgage and Note dated 12/4/79." Also on that same day, Estelle Langendorf executed a power to hypothecate by which she attempted to pledge the $100,000 note and the mortgage as collateral for the "indebtedness of Sheldon P. Langendorf now evidenced (in whole or in part) by note dated 12/4/79 for $75,000.00." On January 4, 1980, another note for $15,000 was signed by Sheldon Langendorf. Both this and the $75,000 note were due June 4, 1980, and on that date they were renewed and combined into one note for $90,000 due December 10, 1980. This latter note was also renewed to become due on June 10, 1981. All of the notes indicated that the proceeds of the loans were being used as working capital for the purchase of an insurance company.

In April 1981, the bank received a $45,000 principal reduction from Sheldon Langendorf, and when a like amount plus accrued interest remained unpaid on the $90,000 note, the bank sued to foreclose the mortgage on defendants' home. During a bench trial, the trial court found that there were no funds disbursed by the bank under the December 4, 1979, $100,000 note and granted defendants' motion for a directed finding at the close of the bank's case. This appeal followed.

---

[1]These securities were given to the bank by Sheldon's father to be used as additional collateral for the loan.

OPINION

The bank contends that the trial court's ruling that there was no consideration for the mortgage on defendants' home was based upon the erroneous finding that it disbursed no funds under the $100,000 note securing the mortgage. Pointing out that it paid Sheldon Langendorf $75,000 on December 4, 1979, and $15,000 on January 4, 1980, the bank argues that the mortgage constituted a valid lien on the defendants' home in the amount of the actual disbursement, or $90,000. Defendants maintain that there was no consideration for the mortgage because the bank, not having paid any money to Estelle, made no disbursement under the $100,000 note. They argue that the $90,000 paid by the bank was on the notes signed only by Sheldon in a separate transaction unrelated to the mortgage.

This argument, however, does not necessarily support a finding of lack of consideration, since "consideration for a mortgage need not move directly from the mortgagee to the mortgagor. The consideration may consist in a loan to a third person" (*Riddle v. LaSalle National Bank* (1962), 34 Ill. App. 2d 116, 119-20, 180 N.E.2d 719, 721), and the validity of a mortgage does not depend on immediate disbursement of funds.

> "A mortgage is security for a debt and without a debt it has no effect as a lien. [Citations.] A mortgage may be taken to secure future advances, but it can only take effect as a lien from the time some debt or liability secured by it is created. If there is no mortgage debt or obligation in existence there is nothing for the mortgage to operate on, and *the lien begins only when money is advanced or the contemplated debt comes into existence in the course of dealing between the parties.* The lien is measured by the extent of the advances and the amount of the debt. [Citations.]" (Emphasis added.) (*Freutel v. Schmitz* (1921), 299 Ill. 320, 323, 132 N.E. 534, 535. See also *Collins v. Carlile* (1851), 13 Ill. 254.)

Defendants further argue that a mortgage to secure a particular debt is not enforceable as the security for a different debt, but the case cited by them, *Totten v. Totten* (1920), 294 Ill. 70, 128 N.E. 295, does not support their position. Rather, in *Totten,* where two distinct debts were involved, the court based its holding on the intention of the parties.[2] It is to the intention of the parties then that we will turn in our

---

[2]Defendants also refer us to *Ogden v. Ogden* (1899), 180 Ill. 543, 54 N.E. 750. In *Ogden,* however, the court's holding was based partially on the existence of third-party rights with respect to the mortgaged property. There is no such third party in the instant case.

analysis of this transaction, and in this regard we initially note that their intention may control even where a mortgage itself is technically deficient.

"The doctrine of equitable mortgages is based upon the principle that equity will interpret an agreement according to the intent of the parties as evinced therein, and if not contrary to some positive rule of law or public policy, will give it effect even though it does not meet the technical requirements of the law; hence where an instrument manifests an intent to charge or pledge property as security for a debt, and the property is identified, a lien will be recognized in equity." *Trustees of Zion Methodist Church v. Smith* (1948), 335 Ill. App. 233, 237, 81 N.E.2d 649, 650.

■ It is well established that, as between the parties, construction of a mortgage involves consideration of all instruments executed by the contracting parties in the course of the transaction, and such construction must take place within the context of the overall transaction. (*Tepfer v. Deerfield Savings & Loan Association* (1983), 118 Ill. App. 3d 77, 454 N.E.2d 676.) We turn, then, to an examination of the documents executed by the parties, the authenticity of which defendants do not deny.

The mortgage itself, signed by both defendants, declares that they are indebted to the bank on the $100,000 note, which is also signed by them and specifies that it is secured by the mortgage. Additionally, the $100,000 note states that the proceeds of the loan, as evidenced by the note, are to be used as working capital for the purchase of an insurance company. The note expressly states, in a typewritten provision, that it is "given as collateral security." With respect to this provision, it has been held that a creditor may hold two notes of a debtor for the same debt, one note collateral to the other. See *Parish Bank & Trust Co. v. Wennerholm Brothers* (1942), 313 Ill. App. 121, 39 N.E.2d 383.

■ On the same day that the mortgage and $100,000 note were executed, December 4, 1979, the bank issued a cashier's check for a commercial loan in the amount of $75,000 to Sheldon Langendorf and that disbursement was evidenced by a note signed by Sheldon but not by Estelle. Although defendants argue that the $75,000 note was an entirely separate transaction, the note expressly stated in a typewritten provision that it was secured by the earlier mortgage and the prior note of December 4, 1979, and that the proceeds were to be used as working capital for the purchase of an insurance company. Such language indicates that the $75,000 note constituted part of the

original transaction contemplated by the parties when they executed the mortgage.

Estelle Langendorf also executed an undated "power to hypothecate" in an apparent attempt to pledge the mortgage and the $100,000 note as collateral for the "indebtedness of Sheldon P. Langendorf now evidenced (in whole or in part) by note dated 12/4/79 for $75,000." Defendants now argue that this document had no legal effect and that the power, alleged by defendants to have been executed after December 4, 1979, could not have affected the parties' intent on December 4. It is not necessary, however, for this court to resolve those issues since, whatever the actual legal effect of the power to hypothecate, Estelle Langendorf did execute the document in question and it certainly constitutes evidence of her intent. (See *Tepfer v. Deerfield Savings & Loan Association* (1983), 118 Ill. App. 3d 77, 454 N.E.2d 676, since it specifically refers to the mortgage, the $100,000 note and the $75,000.)

> " 'Construing contemporaneous instruments together means simply that if there are any provisions in one instrument limiting, explaining, or otherwise affecting the provisions of another, they will be given effect.' [Citation.] '[C]ontemporaneous means so proximate in time as to grow out of, elucidate and explain the quality and character of the transaction, or an occurrence within such time as would reasonably make it a part of the transaction.' [Citation.]" (*Tepfer v. Deerfield Savings & Loan Association* (1983), 118 Ill. App. 3d 77, 80, 454 N.E.2d 676, 679.)

The power to hypothecate thus expressly indicates an intention to use the mortgage and the $100,000 note as security for the loans to Sheldon Langendorf for the purpose of buying an insurance company.

Another $15,000 was advanced by the bank on January 8, 1980, and such disbursement was evidenced by a note signed only by Sheldon Langendorf. That note also stated that it was secured by the mortgage and note of December 4, 1979, and that the proceeds of the note were to be used as working capital for the purchase of an insurance company. The $75,000 note and the $15,000 note were renewed by a note dated June 4, 1980, and renewed again by a note dated December 10, 1981. Both renewal notes also referred to the purchase of an insurance company and stated that they were secured by the mortgage and note of December 4, 1979. Mark Rubert, who personally handled the transaction for the bank, testified that he told defendants that they were executing the mortgage and the $100,000 note as collateral security for subsequent loans to be made to Sheldon for the

purchase of the insurance company. He also told them that the hypothecation signed by Estelle Langendorf was for the purpose of allowing Sheldon to borrow from the bank on his own signature based on the $100,000 note and mortgage.

The record also discloses that the $75,000 note and the subsequent notes executed by Sheldon stated that the $75,000 note was secured by certain securities as well as by the $100,000 note and the mortgage. Those securities, which were the property of Sheldon's father, were returned by the bank after a payment of $45,000 was made on the $90,000 debt. To accept defendants' argument that the mortgage was totally unrelated to the two notes executed by Sheldon would require us to totally disregard the references in the typewritten provision in each of those notes that it was secured by the mortgage. It is well established that "[e]ach clause and all of the language used must, if possible, be given meaning, life and effect. [Citations.]" (*Sears v. First Federal Savings & Loan Association* (1971), 1 Ill. App. 3d 621, 627, 275 N.E.2d 300, 303.) We therefore find no merit in defendants' contention that the $90,000 disbursement to Sheldon Langendorf was completely unrelated to the $100,000 note and mortgage.

In the light of the documents involved in the transaction, the testimony of the bank officer who handled the transaction, and the subsequent conduct of defendants with respect to the collateral securities surrendered after partial payment of the debt, we find that the bank made a *prima facie* showing of consideration for the mortgage on the basis that it and the notes were all part of the initial transaction as contemplated by defendants and the bank.

For the reasons stated, the order appealed from is reversed and this cause is remanded for further proceedings consistent with the content of this opinion.

Reversed and remanded.

MEJDA, P.J., and PINCHAM, J., concur.