In re Theodore C. ZURLIENE and Irene B. Zurliene, Debtors.

EAGLE BANK, Plaintiff,

v.

COMMUNITY BANK OF TRENTON, Theodore C. Zurliene and Irene B. Zurliene, Defendants.

Bankruptcy No. BK 88–30422.
Adv. No. 88–0186.

United States Bankruptcy Court, S.D. Illinois.

March 9, 1989.

Suelthaus & Kaplan, Fairview Hgts, Ill., of counsel, Craig A. Smith, St. Louis, Mo., for Eagle Bank.

Myron Hanna, Thompson & Mitchell, Belleville, Ill., for Community Bank of Trenton.

Steven N. Mottaz, Alton, Ill., for debtors/defendants.

## ORDER

KENNETH J. MEYERS, Bankruptcy Judge.

This matter is before the Court on an Amended Complaint to Determine Secured Status and to Avoid Alleged Security Interest filed by Eagle Bank [1] ("Eagle") against Community Bank of Trenton ("Community"). Also before the Court is debtors' objection to Community's proofs of claim in which debtors have adopted the allegations contained in Eagle's amended complaint. Eagle and the debtors allege that Community's three proofs of claim against the bankruptcy estate (which, coincidently, are claim numbers 1, 2, and 3) are unsecured.

### Proof of Claim #1

In proof of claim #1, Community requests $133,975.65 plus interest accrued from May 24, 1988 (the date debtors filed their bankruptcy petition) plus attorney's fees. The claim is based on a $112,200.00 promissory note dated June 12, 1986 plus $21,775.65 worth of interest accrued prior to the filing of the petition. The June 12, 1986 promissory note was a renewal of a previous note, which was itself a renewal and combination of several prior notes, some of which were also renewal notes. A copy of the June 12, 1986 note is attached to proof of claim #1.

Also attached to the proof of claim are copies of a UCC–1 financing statement dated November 25, 1969, and three UCC–3 continuation statements dated October 4, 1974, August 9, 1979 and July 11, 1984, respectively. The financing statement, which was recorded in the St. Clair County Illinois Recorder of Deeds office, covers the following items of property:

---

1. Eagle Bank is now known as Landmark Bank of Highland. In this Order it will be referred to as "Eagle" in order to avoid any confusion.

Any and all farm crops whether growing or harvested, produced [sic], equiptment [sic], machinery, livestock or other personalty now owned or hereafter acquired in any manner, including but not limited to raising, purchasing, gift or bequest and the accessories, increases, ingredients, proceeds and products thereof. Farm crops located on the Theodore Zurliene farm. All steers, heifers, calves, present and future.

The June 12, 1986 promissory note makes reference to this financing statement and to the July 11, 1984 continuation statement.

The June 12, 1986 note is on a pre-printed "promissory note and security agreement" form. By checking alternative boxes on the form, a lender can select from a variety of options for securing the note. For example, subsection (e) of the form, which was not checked on the June 12, 1986 promissory note, states: "If checked, this note is not further secured." Another box on the form is the one opposite subsection (g). That subsection states: "If checked, this note is secured by the Security Agreement hereafter and Borrower hereby grants to the lender a Security interest under the Uniform Commercial Code in the following described Collateral." The subsection then lists several categories of collateral, such as inventory, equipment, farm products and so on. Each category is preceded by a box and followed by a brief generic description of the collateral to be secured. The subsection also has a space for the listing of additional collateral. None of the boxes in subsection (g) of the June 12, 1986 promissory note were checked and the space for listing additional collateral was left blank.

The only box in the security section of the June 12, 1986 promissory note which was checked was the one opposite subsection (f) which states: "If checked, this Note is secured by a separate <u>Financing Statement</u> dated <u>11–24–69 filed for record in St. Clair Co. as File # B78884 & Cont[inuation]. St[atement]. dated 7–11–84 as</u>

# B184477." [2] It is undisputed that Community and the debtors never executed a separate security agreement in connection with this loan transaction.

■ Eagle argues, *inter alia,* that Community's claim # 1 is unsecured because a security interest cannot exist in the absence of a security agreement. In response, Community argues that a separate security agreement is not necessary because reading the promissory note together with the financing statement shows that debtors intended to give and Community intended to obtain a security interest in the collateral listed on the financing statement.

Section 9–203(1)(a) of the Illinois Commercial Code ("ICC") [3] provides in pertinent part that "a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless: (a) ... the debtor has signed a security agreement which contains a description of the collateral...." "Security agreement" is defined by ICC § 9–105(1)(*l* ) as "an agreement which creates or provides for a security interest." ICC § 1–201(37) defines "security interest" as "an interest in personal property or fixtures which secures payment or performance of an obligation." These provisions indicate that a security interest cannot exist in the absence of a security agreement. *In re Martin Grinding and Machine Works, Inc.,* 42 B.R. 888, 891 (Bankr.N.D. Ill.1984), *aff'd* 793 F.2d 592 (7th Cir.1986); *Allis Chalmers Corp. v. Staggs,* 117 Ill. App.3d 428, 453 N.E.2d 145, 148, 72 Ill.Dec. 840, 843 (1983).

The purpose of a financing statement is to put creditors on notice that a party may have a perfected security interest in the described collateral and. that further inquiry may be prudent. *Martin Grinding, supra; Mitchell v. Shepherd Mall State Bank,* 458 F.2d 700, 704 (10th Cir.1972); *Allis–Chalmers, supra; Interstate Steel Co. v. Ramm Mfg. Corp.,* 108 Ill.App.3d 404, 438 N.E.2d 1381, 1385, 64 Ill.Dec. 62,

---

**2.** The underlined portions represent typewritten additions to this section of the note.

**3.** The ICC is the Illinois version of the Uniform Commercial Code and can be found at Chapter 26 of the Illinois Revised Statutes.

66 (1982). A financing statement cannot serve as a security agreement absent language in the statement which would constitute a grant of a security interest. *Mitchell, supra.* *See also In re Cambridge,* 34 B.R. 88, 89 (Bankr.W.D.Mo.1983); *Matter of H.L. Cement Co.,* 12 B.R. 165, 168 (Bankr.W.D.Pa.1981).

In the present case, the November 24, 1969 financing statement simply lists the collateral that allegedly secured the indebtedness. There is no indication in the language of either the financing statement or the subsequently filed continuation statements that debtors granted Community a security interest in the collateral listed therein.

Community urges the Court to use the "Composite Document" theory to find that a security agreement exists. Under the Composite Document theory (which was adopted by the Seventh Circuit in *Wambach v. Randall,* 484 F.2d 572 (7th Cir. 1973)), a party may prove the existence of a security agreement through all documentation surrounding a loan transaction. *See In re Data Entry Service Corp.,* 81 B.R. 467, 469 (Bankr.N.D.Ill.1988). Therefore, this Court must decide whether the June 12, 1986 promissory note together with the November 24, 1969 financing statement objectively indicates that the parties intended to create a security interest. *Data Entry Service, supra,* citing *In re Bollinger Corp.,* 614 F.2d 924, 927–28 (3rd Cir.1980).

■ While this Court agrees with Community that no *specific* words of grant are necessary in order to create a security agreement, it also believes that, in the absence of a separate written security agreement, there must be some language reflecting the parties' desire to grant a security interest, in the documents surrounding the transaction, in order to establish the existence of a security agreement under ICC § 9–203. *In re Modafferi,* 45 B.R. 370, 372 (S.D.N.Y.1985); *In re Murray Brothers,*

*Inc.,* 53 B.R. 281, 284 (Bankr.E.D.N.C. 1985).

■ In proof of claim # 1, neither the promissory note nor the financing statement contain language indicating that debtors intended to grant Community a security interest in the collateral listed on the financing statement. The note makes only one, indirect reference to the collateral in which Community now claims a security interest. That reference is at subsection (f) of the note and it indicates that the note is "secured by a separate financing statement dated 11–24–69." This reference is insufficient to show the existence of a security agreement because the financing statement does not contain any language which would indicate that debtors had granted Community a security interest in the collateral. The financing statement merely contains a listing of the collateral.

Community disputes this view, arguing that it places form over substance. It urges the Court to construe the documents liberally to find that the parties intended to create a security interest. It also argues that there would have been no reason for the debtors to have signed the financing statement[4] unless they had intended to create a security interest.

■ In addition to being filed for the purpose of perfecting a security interest after or together with the attachment of a security interest, financing statements may also be filed before the attachment of a security interest as a notice to third parties that a security interest may be claimed in the future by the filing party. The priority of a claimant's security interest would then date back to the date of filing. ICC § 9–312(5)(a); *Murray Brothers, supra,* 53 B.R. at 284. *See also, Martin Grinding, supra,* 793 F.2d at 596–97. Therefore, since a financing statement may be filed for reasons other than the perfection of existing security agreements, the mere fact that the parties in the present case signed

---

**4.** The November 24, 1969 financing statement was only signed by one of the debtors. This fact forms the basis for another of Eagle's arguments against Community's proof of claim # 1. Still another of Eagle's arguments questions the adequacy of the description of the collateral contained in the financing statement. In light of this Court's finding that there is no security agreement, these other issues need not be addressed.

and filed a financing statement does not mean that they intended to create a security agreement in the listed collateral.

The ICC states that its terms are to be construed liberally, *see* ICC § 1–102(1). This refers to the terms of the Act itself and not to security agreements under the Act. *Modafferi, supra,* 45 B.R. at 370, *quoting In re Broward Auto Brokers, Inc.,* 11 UCC Rep.Serv. 402, 404 (Bankr.S. D.Fla.1972). After rejecting the "liberal construction" argument, the *Modafferi* court went on to state:

> The UCC's requirements for the creation of a security interest are simple and clearly set forth. It is not unreasonable to require that a creditor who seeks to obtain priority over all other creditors comply with these minimal requirements as a condition for being accorded such favored treatment.

*Id., citing Mitchell,* 458 F.2d at 704.

In the present case, Community committed what at first glance appears to have been a relatively minor mistake of not checking the box opposite subsection (g) on the June 12, 1986 promissory note. However, in the absence of any language on the note or financing statement evidencing debtors' intent to grant Community a security interest this Court has no choice but to conclude that Community's proof of claim # 1 is unsecured.

### Proof of Claim # 2

In the second proof of claim objected to by Eagle and the debtors, Community requests $74,831.16 plus interest accrued from May 24, 1988 and attorney's fees. The claim is based on a $100,000.00 loan made by Community to debtors on July 17, 1981, which was secured by a first mortgage on two parcels of real estate in St. Clair County, Illinois.[5] The loan has been extended on several occasions and for progressively smaller amounts. The latest loan extension agreement, which was submitted by Community as part of this proof of claim, is for $60,000.00 and is dated March 12, 1986.[6]

In March of 1986, debtor Theodore Zurliene approached Community about selling a portion of the real estate securing the July 17, 1981 mortgage to Jack Faust for $70,000.00. Community agreed and soon thereafter the property was sold. Leroy Zimmerman, Community's executive vice-president, agreed that Zurliene could retain approximately $20,000.00 of the proceeds of the sale to install a water system on his property. The remaining $50,000.00 was paid to Community.[7]

Subsequently, Community released its first and second mortgages on the portion of the real estate sold by debtors to Faust. The proceeds of the sale were applied by Community towards debtors' first and second mortgages on the real estate and towards ten commercial loans secured by debtors' personal property. In the case of the two mortgages, only interest was paid and there was no reduction in the outstanding principal.

Eagle claims that the proceeds of the sale received by Community should only have been applied to the July 17, 1981 note as debtors alledgedly had intended. Eagle further claims that allowing Community to apply the proceeds towards debts other than its first mortgage works an injustice against the debtors, Faust and Eagle.[8]

The general rule in Illinois regarding the application of payments made by a debtor to a creditor who is owed on several accounts is that "the debtor may control the application of payments made on his ac-

---

**5.** A second mortgage on this real estate, dated March 9, 1983 is the basis for Community's Proof of Claim # 3. Eagle loaned debtors $108,- 602.83 on May 3, 1985 which is partially secured by a third mortgage on the same real estate.

**6.** $14,831.16 of Community's claim is for interest accrued from March 12, 1986 until the filing of the bankruptcy petition.

**7.** Community states that it received $49,662.28 from the sale of the real estate.

**8.** Originally, Eagle also alleged that proof of claim # 2 was unsecured because the loan extension agreement did not include a future advance clause. However, at the hearing, Eagle conceded that the extension agreement, without the advance of additional funds, did not constitute a future advance under Illinois law.

count, and if he does not do so the creditor may apply [them] where he chooses." *Liese v. Hentze,* 326 Ill. 633, 639, 158 N.E. 428 (1927). *See also Griffin Wellpoint Corp. v. Engelhardt, Inc.,* 92 Ill.App.3d 252, 414 N.E.2d 941, 949, 46 Ill.Dec. 888, 896 (1980); *Village of Winfield v. Reliance Insurance Co.,* 64 Ill.App.2d 253, 212 N.E. 2d 10, 12 (1965). This general rule will not be applied when it appears that its application would work an injustice. *Alexander Lumber Co. v. Aetna Co.,* 296 Ill. 500, 129 N.E. 871 (1921); *Village of Winfield, supra.*

■ In the present case, the testimony of Theodore Zurliene established only that he "intended" that the approximately $50,-000.00 in sale proceeds he gave to Community would be applied towards the first mortgage. There was no evidence that he actually told Community how he wanted the proceeds to be applied. Additionally, the fact that debtors consulted with Community prior to the sale to assure the release of its mortgages on the real estate in exchange for receiving part of the proceeds is not sufficient to show that debtors actually indicated to Community that the proceeds should be applied towards their first mortgage. Therefore, under the general rule regarding application of payments, Community had the right to apply the proceeds as it saw fit.

■ Eagle, citing *Alexander Lumber Co., supra,* argues that use of the general rule would work an injustice because it would result in debtors owing much more to Community on the first mortgage; leave Faust with Eagle's lien on the property he bought from debtors; and leave Eagle's mortgage behind debtors' $75,000.00 indebtedness to Community instead of behind a $25,000.00 indebtedness.

The *Alexander Lumber* case illustrates just how narrow the exception to the general rule is. In that case virtually none of the payments made to a creditor by the debtor for a particular job were applied by the creditor to invoices on that job. The court held that the creditor could not look to the debtor's surety for payment of debts

incurred on that job. Under these circumstances, deviation from the general rule was justified because otherwise the surety would have been obligated to pay for debts of the principal which had no relation to the contract of surety. The *Alexander Lumber* court characterized this result as "so inequitable and unfair as to shock the conscience of all fair-minded persons." 296 Ill. at 506, 129 N.E. 871.

In the present case, Community's application of the sale proceeds to several debts owed it by the debtors did not result in *any* injustice. In the absence of any direction from the debtors, Community was not obligated to apply the proceeds to the first mortgage. Debtors remain obligated, first to Community and then to Eagle. The fact that Eagle is now "further behind" Community than it would have been had all the proceeds been applied to the first mortgage is not an injustice that would merit an exception to the general rule.

■ Nor does this Court find persuasive Eagle's arguments that Faust was harmed by Community's application of the payments. Faust himself is not a party in this matter and Eagle has not explained why it should be able to raise his allegations against Community when he has not done so himself. Furthermore, there was no evidence that the existence of Eagle's lien against the property was hidden from Faust so as to prevent him from discovering it before he purchased the property from debtors.

The Court concludes that there is no reason to depart from the general rule that, absent direction from the debtor, a creditor may apply payments to whichever of debtor's accounts the creditor chooses. Therefore, the Court will deny the objection to proof of claim # 2.

### Proof of Claim # 3

In the final proof of claim objected to by Eagle and the debtors, Community requests $122,539.92 plus interest accrued since May 24, 1988 and attorney's fees.

The claim is based on a mortgage[9] and separate promissory note for $100,000.00 dated March 9, 1983 and a renewal note for $106,039.12 dated November 4, 1986 plus $16,500.08 in interest accrued through May 24, 1988.

No money was advanced on the March 9, 1983 note and mortgage on the date it was executed. The entire $100,000.00 sum of this note and mortgage was disbursed over a twelve month period after the execution of the March 9, 1983 note and mortgage,[10] said disbursements being evidenced by six notes, two of which were renewal notes. Each of the six notes stated that it was secured by the note and mortgage dated March 9, 1983.

The six notes were each renewed several times. Ultimately, all of these notes were consolidated into one note, the most recent one of which is the November 4, 1986 note for $106,039.12. Each of these aforementioned notes also stated that it was secured by the note and mortgage dated March 9, 1983.

█ It is undisputed that no funds were disbursed under the March 9, 1983 note and that the funds that were disbursed after March 9, 1983 were evidenced by other notes. Eagle characterizes these subsequent payments as "future advances." There is no provision in the March 9, 1983 mortgage which states that it was given to secure future advances. Eagle argues that the failure of the mortgage to identify the future notes and to include a future advance clause prevents the mortgage from extending to secure later advances on subsequent notes.

This Court disagrees with Eagle's characterization of the disbursements made under the March 9, 1983 mortgage as future advances. The total amount disbursed in the subsequent notes was $100,000.00, which equals the face amount of the mortgage. The fact that the funds were disbursed after the mortgage was executed does not make them future advances. No funds were disbursed over the $100,000.00 amount of the mortgage, therefore, none of the disbursements can be termed a future advance.

A case strikingly similar to the present case is *Peterson Bank v. Langendorf,* 136 Ill.App.3d 537, 483 N.E.2d 279, 90 Ill.Dec. 961 (1985). In that case, the defendants had obtained a $100,000.00 line of credit from the bank by signing a mortgage and note for that amount on December 4, 1979. They did not receive any proceeds upon signing the note and mortgage but, later that same day, one of the defendants executed a promissory note for $75,000.00 and received a cashier's check for that amount. The $75,000.00 note stated that it was secured in part by the "Mortgage and Note dated 12/4/79." On January 4, 1980 another note, this one for $15,000.00, was executed by one of the defendants. The two notes were later renewed and combined and the combined note was itself renewed and was to become due on June 10, 1981.

By the due date the bank had only received $45,000.00 of its outstanding principal so it commenced a foreclosure action to collect the remaining amount due. The trial court found that no funds had been disbursed by the bank under the December 4, 1979 note and therefore granted the defendant's motion for directed verdict at the close of the bank's case.

On appeal, the Illinois Appellate Court reversed. It held that the validity of a mortgage does not depend on the immediate disbursement of funds. 483 N.E.2d at 280, 90 Ill.Dec. at 962. It also held that the intention of the parties to the mortgage may control even where the mortgage itself is technically deficient. 483 N.E.2d at 281, 90 Ill.Dec. at 963.

The Appellate Court rejected the argument that the $75,000.00 and $15,000.00 notes were separate transactions from the December 4, 1979 note and mortgage. The Court observed that the subsequent notes stated that they were secured by the De-

---

**9.** This mortgage is a second mortgage on the same property securing proof of claim # 2. See footnote 5, *supra.*

**10.** Eagle's third mortgage was executed on May 3, 1985, which was after the $100,000.00 secured by Community's second mortgage had been disbursed.

cember 4, 1979 note and mortgage. It therefore concluded that the subsequent notes were part of the original transaction contemplated by the parties when they executed the mortgage. As a result, the subsequent notes were secured by the mortgage.

A similar intent of the parties to secure subsequent notes by reference to the original note and mortgage can be seen in the present case. Also, in both cases the funds were not disbursed until after the time the note and mortgage were executed. Finally, in neither case did the amount disbursed exceed the face amount of the original note and mortgage. It is clear that Illinois case law recognizes the validity of the type of loan used by Community in proof of claim # 3.

Although the subsequent notes do not represent future advances, Eagle attempts to attack Community's claim by reference to the definition of "future advance" found at Ill.Rev.Stat., ch. 17, ¶ 312.3. Eagle's reliance on this statute is misplaced because it applies to "revolving credit loans" [11] which the disbursements in the present case clearly are not. Similarly, Eagle's reliance on Ill.Rev.Stat., ch. 30, ¶ 37a (the so-called future advance statute) is also misplaced because the disbursements were not future advances. Accordingly, the Court finds that the objections to proof of claim # 3 are without merit.

IT IS THEREFORE ORDERED as follows:

Proof of claim # 1, filed by Community Bank of Trenton, is UNSECURED.

The objection to Community Bank's proof of claim # 2 is DENIED.

The objection to Community Bank's proof of claim # 3 is DENIED.

---

11. Ill.Rev.Stat., ch. 17 ¶ 6405 defines "revolving credit" as "an arrangement ... pursuant to which it is contemplated or provided that the lender may from time to time make loans or advances to or for the account of the debtor through the means of drafts, items, orders for the payment of money, evidence of debt or similar written instruments, ... which loans or advances are charged to an account in respect of which account the lender is to render bills or statements to the debtor at regular intervals ... the amount of which bills or statements is payable by and due from the debtor on a specified date stated in such bill or statement or at the debtor's option, may be payable by the debtor in installments."