In re MOUNT CALVARY BAPTIST CHURCH, a/k/a Mount Calvary Baptist Church & School, Debtor.

CHURCH MUTUAL INSURANCE COMPANY, Plaintiff,

v.

MOUNT CALVARY BAPTIST CHURCH, a/k/a Mount Calvary Baptist Church & School and Seaway National Bank, Defendants.

Bankruptcy Nos. 89 B 15632, 90 A 0174.

United States Bankruptcy Court, N.D. Illinois, E.D.

Dec. 29, 1993.

Lyle, Slaughler & Brewer, Chicago, IL, for Mount Calvary Baptist Church.

Johnson & Bell, Chicago, IL, Gregory & Associates, Troy, MI, for Church Mut. Ins. Co.

Carney & Brothers, Chicago, IL, for Seaway Nat. Bank.

### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

DAVID H. COAR, Bankruptcy Judge.

This matter comes before the Court on Plaintiff's Complaint for declaratory relief. Mount Calvary Baptist Church ["Mt. Calvary"] filed for relief under Chapter 11 of the Bankruptcy Code on September 18, 1989. In November, 1989, Church Mutual Insurance Company ["Church Mutual"] filed this complaint in the U.S. District Court for the Northern District of Illinois. Subsequently, the complaint was referred to this Court pursuant to 28 U.S.C. § 157(a). This is a related to matter as to which jurisdiction is conferred by 28 U.S.C. § 1334(b). Motions for summary judgment were filed by both Plaintiff, Church Mutual, and Seaway National Bank ["Seaway"]. The Court denied both motions in a Memorandum Opinion and Order dated November 6, 1992 ["Opinion"]. Trial on this matter was held on September 14, 15 and 17, 1993. Much about this proceeding is set forth in that Opinion and will not be repeated here. The Court now enters Findings of Fact and Conclusions of Law after review of the pleadings, memoranda and evidence presented.

### FINDINGS OF FACT

1. On September 11, 1989, a fire damaged the building and contents of Mt. Calvary Baptist Church.

2. On May 11, 1981, Mt. Calvary executed its Installment Note payable to Seaway in the principal sum of $1,200,000.00. To secure the Installment Note, on May 11, 1981, Mt. Calvary conveyed to Seaway a first mortgage lien on the Mt. Calvary church located at 1257–59 West 111th Street, Chicago, Illinois. The Trust Deed was amended December 31, 1981.

3. On or about December 7, 1987, Church Mutual issued a Multi–Peril contract of insurance, number 061970–02–496353 (the "Policy") to Mt. Calvary, subject to terms, conditions, limitations and exclusions in the Policy. It is under this policy that Mt. Calvary claims coverage for losses incurred as a result of the September 11, 1989 fire.

4. Seaway is named as mortgagee under the Policy.

5. At various times, Church Mutual issued various other policies to Mt. Calvary, including, but not limited to, the following:

| | | |
|---|---|---|
| a. | Worker's Compensation | 061970–07–500295 |
| b. | Worker's Compensation | 016970–07–557465 |
| c. | Business Automobile | 061970–09–502786 |
| d. | Business Automobile | 016970–09–557466 |
| e. | Commercial Fire | 016970–13–564633 |

6. On July 5, 1989, Church Mutual mailed to Mt. Calvary correspondence and Notices of Cancellation for the Business Automobile policy number 016970–09–557466 and the Worker's Compensation policy number 016970–07–557465. Mt. Calvary received this correspondence before July 12, 1989.

7. On July 10, 1989, Church Mutual mailed to Mt. Calvary correspondence and a Notice of Cancellation for the Multi–Peril Policy number 061970–02–496353. Mt. Calvary received the correspondence and notice of cancellation on July 12, 1989.

8. On July 10, 1989, Church Mutual mailed to Seaway a Notice of Cancellation. Seaway received the notice of cancellation on or before July 24, 1989.

9. The cancellation notices provided for cancellation of the policies on the following dates:

| | | |
|---|---|---|
| a. | Business Automobile | July 17, 1989 |
| b. | Worker's Compensation | July 17, 1989 |
| c. | Multi–Peril | July 22, 1989 |

10. All of the cancellations were for failure to pay premiums timely.

11. Each of the letters which accompanied the notices of cancellation included the amount of premium past due and provided that that amount must be received within 10 days from the date of "this notice" or the policy would be canceled. Each also contained the following language:

"Please send us a BANK MONEY ORDER or CASHIER'S CHECK for $_____ and keep your protection uninterrupted. Uncertified personal checks will *not* be accepted."

12. The letters indicated that the amount of overdue premiums on each policy was as follows:

| | | |
|---|---|---|
| a. | Business Automobile | $147.25 |
| b. | Worker's Compensation | $932.50 |
| c. | Multi–Peril | $292.75 |

13. On or about July 13, 1989, Willie Barron ("Barron") was financial secretary of Mt. Calvary and the duties of this office included the payment of bills.

14. On July 13, 1989, Barron wrote a check to Church Mutual for the total of past due premiums indicated in the July 5 and July 10 correspondence from Church Mutual ($1372.50).

15. Barron placed the check and copies of the three cancellation notices received in July, 1989 in an envelope and mailed the envelope to Church Mutual on July 13, 1989.

16. The envelope from Mt. Calvary was postmarked July 13, 1989 and received by Church Mutual on or about July 18, 1993. Mt. Calvary's business check in the amount of $1372.50 was deposited to Church Mutual's account in July 18, 1989. This check was not in the form of a money order or cashier's check.

17. For all relevant periods, Sharon Kleinschmidt ("Kleinschmidt") was Billing Accounts Receivable Supervisor for Church Mutual.

18. Kleinschmidt caused the $1372.50 payment from Mt. Calvary to be applied to earned premiums due on canceled or expired (terminated) policies rather than to the overdue premiums referred to in the notices of cancellation and correspondence to Mt. Calvary dated July 5 and July 10, 1989.

19. On July 18, 1989, Kleinschmidt wrote to Mt. Calvary advising it of the applications of the $1372.50 payment.

20. On July 20, 1989, Barron received Kleinschmidt's letter and called to protest the application of the payment. He was told that there was nothing that could be done to change the outcome.

21. In late August, 1989, Barron made one or two additional phone calls to Church Mutual protesting the application of the July 13, 1989 payment—all to no avail. Barron was advised by Kleinschmidt that the Multi–Peril Policy was canceled effective July 22, 1989.

22. Church Mutual had an internal procedure whereby payments received without accompanying direction as to how the payment was to be applied would be applied first to earned premiums on canceled or expired policies and then to earned premiums on policies in effect. This policy was never communicated to insureds unless they asked.

23. Kleinschmidt testified that she never saw the notices of cancellation which Barron placed in the envelope along with the check. The Court finds that Kleinschmidt's testimony in this regard is based upon her deductions from what she did with respect to the $1372.50 payment and is not credible.

24. Kleinschmidt should have known and had reason to know that Mt. Calvary's check dated July 13, 1989 was tendered to pay the earned premiums on the three policies on which cancellation notices were pending on July 18, 1989.

25. On or about July 18, 1989 (before application of the July 13, 1989 check), Mt. Calvary had earned premiums due on account for canceled or expired policies in an amount greater than $1372.50.

26. On or about July 18, 1989, Church Mutual had the following additional internal policies/procedures which were not communicated to insureds unless they asked specifically:

a. Payments to reinstate policies (after cancellation notices sent) must be in the form of money orders or cashier's checks. There were two exceptions:

1. There was a "first-time" rule which would allow payment by personal or business check after the first cancellation notice (this exception was available one time only).

2. There was also an exception for "special payment arrangements" pursuant to which an insured could pay by personal or business check after a cancellation notice if the payment was made pursuant to a payment schedule previously agreed to by Church Mutual.

b. There was a 10 day grace period after the 10 day period specified in the reinstatement letter which accompanied the notice of cancellation.

27. For purposes of determining when a payment is made, Church Mutual looks to the date of the postmark on the envelope containing the payment.

### CONCLUSIONS OF LAW & ADDITIONAL FINDINGS OF FACT

█ At the heart of this dispute is whether a contract for insurance was in force between Church Mutual and Mt. Calvary on September, 11, 1989. Specifically, the parties disagree about whether the Multi–Peril Policy was effectively canceled as of July 22, 1989. Insurance policies are contracts, and should be interpreted as such. *Horning Wire Corp. v. Home Indem. Co.*, 8 F.3d 587, 589 (7th Cir.1993). The law is well settled that a contract requires an offer, acceptance, and consideration. *Serpe v. Williams*, 776 F.Supp. 1285, 1287–88 (N.D.Ill.1991). Additionally, there must be a meeting of the minds about both the existence of a contract and its terms. *Chicago Litho Plate Graining Co., Ltd. v. Allstate Can Co.*, 838 F.2d 927 (7th Cir.1988); *Academy Chicago Publishers v. Cheever*, 144 Ill.2d 24, 161 Ill.Dec. 335, 578 N.E.2d 981 (1991). This case presents mixed questions of law and fact regarding whether each element of contract formation has been satisfied.

█ As a preliminary matter, the Court notes that insurance contracts are to be construed strictly against the drafter and in favor of coverage. *Insurance Corp. of Ireland v. Board of Trustees of So. Ill. Univ.*, 937 F.2d 331, 336 (7th Cir.1991); *In re Templeton*, 150 B.R. 214, 221 (Bankr.N.D.Ill. 1993); *Grevas v. United States Fidelity & Guar. Co.*, 152 Ill.2d 407, 178 Ill.Dec. 419, 421, 604 N.E.2d 942, 944 (1992). The Court must construe a contract for insurance to permit the maximum recovery under a reasonable view of its terms. *Templeton*, 150 B.R. at 220. This rule of construction also applies to notices of policy termination. *Farmers Auto. Ins. Ass'n v. Pursley*, 130 Ill.App.2d 980, 267 N.E.2d 734, 737 (1971). See also *Playboy Enters. Inc. v. St. Paul Fire & Marine Ins. Co.*, 769 F.2d 425, 428 (7th Cir.1985) (noting that insurance contracts are rigorously construed against insurers wishing to limit liability or deny coverage). Further, forfeitures of insurance contracts are disfavored under Illinois law. *Playboy Enters.*, 769 F.2d at 428; *Radovanov v. Land Title Co. of Am.*, 189 Ill.App.3d 433, 136 Ill.Dec. 827, 831, 545 N.E.2d 351, 355 (1989), *appeal denied*, 129 Ill.2d 572, 140 Ill.Dec. 680, 550 N.E.2d 565 (1990). An insurer cannot forfeit a policy unless it can

establish a clear right to do so. *Time Ins. Co. v. Vick,* 250 Ill.App.3d 465, 190 Ill.Dec. 48, 51, 620 N.E.2d 1309, 1312 (1993); *Budelman v. American Ins. Co.,* 297 Ill. 222, 130 N.E. 513 (1921). Thus an insurer seeking to cancel a policy has the burden of proof on that issue. *Cullen v. North Am. Co.,* 176 Ill.App.3d 643, 126 Ill.Dec. 95, 531 N.E.2d 390 (1983).

At various times, Church Mutual has maintained that the Policy was canceled on the date that the cancellation notice issued (July 10, 1989). When read together with the reinstatement letter and state policy, it is clear that the cancellation notice advises the debtor that the policy *will be* canceled on the effective date set forth in the notice. The Notice itself was merely the notification required as a matter of due process (and state law) to inform the insured that the policy was being terminated and to provide the insured an opportunity to obtain new coverage. See *Conley v. Ratayzcak,* 92 Ill.App.3d 29, 46 Ill.Dec. 616, 619, 414 N.E.2d 500, 503 (1980) (construing the parallel provision for automobile insurance). Such notice is required by both the Policy itself and by statute. 215 ILCS 5/143.15.[1] Accordingly, the earliest possible date of cancellation of the Policy is July 22, 1989. The Court will now examine whether Mt. Calvary took appropriate actions to avoid cancellation of its insurance coverage.

*OFFER/COUNTER–OFFER*

Whether the policy was canceled on the date that notice was sent (the cancellation to be effective as of the effective date) or whether it was not canceled until the effective date is, under the facts of this case, a metaphysical question—interesting but of little practical significance. For the reasons stated above, the Court concludes that cancellation could not occur until July 22, 1989. However, neither the Policy nor the notice of cancellation gives the insured a right to void a notice of cancellation for non-payment of premiums by tendering payment of the overdue premium before the effective date. No

party has cited to any case law recognizing such a right of the insured and this Court has found no cases to this effect.

The only "right" that the insured has to void the notice of cancellation and keep the policy in force arises from the terms of the form letters which Church Mutual mails with its notices of cancellation. For brevity's sake, the Court will refer to those letters as reinstatement letters. Thus, Church Mutual argues that its July 10, 1989 letter to Mt. Calvary was a written offer to continue (reinstate) coverage which was binding only upon acceptance in strict conformance with its terms. Because Mt. Calvary's check was not in the form of a money order or cashier's check and was not in the amount of $292.75, Church Mutual argues that there was no acceptance of the offer.[2]

Seaway and Mt. Calvary apparently concede that the form of the July 13 check did not meet the terms of Church Mutual's offer. The Defendants argue, however, that the check and accompanying notices of cancellation constituted a counter-offer to Church Mutual which was accepted by Church Mutual when it negotiated the check.

The Defendants contend that the amount set forth in the reinstatement letter (Church Mutual's offer) was not an essential term of the offer so long as the amount tendered was equal to or greater than the amount then overdue. The Defendants are correct. Church Mutual's witnesses offered no policy reason or experience which tended to justify strict adherence to the exact amount specified in the reinstatement letter so long as the amount tendered was not less than the amount due. Church Mutual maintains that the tender of the check, even if accompanied by the notices of cancellation, was too vague to constitute a counter-offer. The fallacy of this argument becomes clear when the offer and counter-offer are examined. Reduced to its essential terms, Church Mutual's reinstatement offer provided as follows:

"If, prior to the effective date of the notice of cancellation, you send us a money order

---

1. Formerly Ill.Rev.Stat. ch. 73, para. 755.15.

2. Church Mutual does not (nor could it) contend that Mt. Calvary's July 13, 1989 check was not

received (postmarked) within the time limits set forth in its July 10 offer.

or cashier's check in an amount not less than the premium payments due on this policy, we will cancel the notice of cancellation and continue the policy in force."

This "offer" by Church Mutual could have been accepted by performance by Mt. Calvary—by sending, before the effective date, a money order or cashier's check in an amount equal to or greater than the amount due.

Instead, Mt. Calvary counter-offered. Mt. Calvary and Seaway contend that the tender of a non-conforming check is a counter-offer, which both rejects an offer and presents an alternative offer. *D'Agostino v. Bank of Ravenswood*, 205 Ill.App.3d 898, 150 Ill.Dec. 759, 563 N.E.2d 886 (1990), *appeal denied*, 137 Ill.2d 664, 156 Ill.Dec. 560, 571 N.E.2d 147 (1991); *Loeb v. Gray*, 131 Ill.App.3d 793, 86 Ill.Dec. 775, 779–80, 475 N.E.2d 1342, 1346–47 (1985). The Defendants maintain that Church Mutual accepted the offer by cashing the check. *In re Avildsen Tools & Machines, Inc.*, 30 B.R. 911, 917 (Bankr. N.D.Ill.1983), *rev'd on other grounds*, 40 B.R. 253 (N.D.Ill.1984); *Sementa v. Tylman*, 230 Ill.App.3d 701, 172 Ill.Dec. 327, 331, 595 N.E.2d 688, 692 (1992). The tender of the business check, accompanied by the notices of cancellation, reasonably communicated to Church Mutual the following:

> "Here is my business check in the amount of the premiums due (on the policies referenced in the enclosed notices), tendered to you prior to the effective date of the notice. You may keep this check if you agree to cancel the notice of cancellation and continue the policy in force."

This counter-offer could be accepted by negotiating the check.

But why should Church Mutual be obligated to do anything other than keep the check and apply it as Church Mutual saw fit? There is no dispute that, as of July 18, 1989, Mt. Calvary owed amounts to Church Mutual on already canceled or terminated policies.

Debtors have a right to direct their creditors as to which accounts they wish to pay. *In re Zurliene*, 97 B.R. 460, 465–66 (Bankr.S.D.Ill.1989); *Greene v. United States*, 447 F.Supp. 885, 892 (N.D.Ill.1985); *Griffin Wellpoint Corp. v. Engelhardt, Inc.*, 92 Ill.App.3d 252, 46 Ill.Dec. 888, 896, 414 N.E.2d 941, 949 (1980). The same principle allows insureds to direct which policies are to be paid to their carriers. *Village of Winfield v. Reliance Ins. Co.*, 64 Ill.App.2d 253, 212 N.E.2d 10, 12 (1965). Because Mt. Calvary's July 13 check contained copies of the cancellation notices, Church Mutual knew or should have known that Mt. Calvary was directing it to apply that check to the three policies referred to in the cancellation notices and therefore constituted a direction to Church Mutual as to how to apply the payment.

Kleinschmidt testified that she applied the payment as she did because she did not receive any direction from Mt. Calvary as to how the payment was to be applied. Had she known, she says, that Mt. Calvary intended that the funds be applied to the premiums due on the three policies for which cancellations were pending, she would have returned the check because it was not a money order or cashier's check. Mt. Calvary's check was not drawn for the exact dollar amount of the premium balance on the Policy. According to Kleinschmidt, she could not tell what Mt. Calvary intended because the check was not made in the exact amount of the premium due on any policy.

To evaluate this testimony and Church Mutual's position with respect thereto, it is helpful to consider what Kleinschmidt had available to her on July 18, 1989. If she called up the status of the Mt. Calvary account on her computer screen, she would have ascertained that there were six Mt. Calvary policies with account balances due. Of the six, three had been canceled or terminated and were not capable of reinstatement. The remaining three were:

| | | |
|---|---|---|
| Multi–Peril | # 061970–02–496353 | $292.75 |
| Worker's Compensation | # 061970–07–557465 | $932.50 |
| Business Automobile | # 061970–09–557466 | $147.25 |

As to these latter three, there were pending notices of cancellation and the envelope containing the $1,372.50 was postmarked July 13, 1989—well within the time period for reinstatement of all three policies. Had she wanted to verify the obvious—all she needed to have done was add the amounts that her computer screen showed her were due on these three policies. Miraculously, that would have produced the figure of $1,372.50.

And this assumes that Mt. Calvary did not tell Church Mutual how to apply the payment. The credible evidence is otherwise. Barron enclosed the three cancellation letters in the envelope with the check. If the notices were in the same envelope as the check, Church Mutual could not have received the latter without having received the former. These notices shouted to Church Mutual how Mt. Calvary wished the payment to be applied.

Further, Barron informed Kleinschmidt of Mt. Calvary's intent with regard to the application of the check during a phone conversation on July 20, 1989. This call occurred two days prior to the cancellation date of the Policy. Because Church Mutual had directions from Mt. Calvary, it was required to abide by Mt. Calvary's wishes in applying the payment. Had Church Mutual wanted to refuse the business check, it could have returned the check to Mt. Calvary without depositing it. Because Church Mutual deposited the check, it was bound to apply the funds in the manner directed by Mt. Calvary.

It is at this point that we encounter the heart of Church Mutual's argument. The law, says Church Mutual, is that its July 10, 1989 letter (which accompanied the cancellation notice) was an offer to reinstate the policy if Mt. Calvary: (1) paid the overdue premium, (2) with a money order or cashier's check, (3) for the exact amount due,[3] (4) within the time frame set forth in the letters. Acceptance of that offer must be in strict accord with the terms of the offer. Citations will be omitted because neither Seaway nor Mt. Calvary seriously dispute this statement of the law.

According to Church Mutual, Mt. Calvary's business check was not an acceptance of its offer. Under a strict view of contract interpretation, Mt. Calvary could not accept by tendering a non-conforming payment. However, the Defendants deny that a particular form of payment was necessary for reinstatement. Rather, acceptance could be effected

by business check in accordance with the prior course of dealings between the parties.

■ Church Mutual argues that even if it received the notices of cancellation and the check, its negotiation of the check cannot be said to constitute acceptance because on the same day that it deposited the check, it mailed to Mt. Calvary a letter which stated that the funds were not being applied to the three policies referred to in the cancellation notices. Church Mutual quotes from the Restatement (2d) of Contracts, § 38, Rejection:

> (2) A manifestation of intention not to accept an offer is a rejection unless the offeree manifests an intention to take it under further advisement.

This argument conveniently ignores the fact that to the extent that Mt. Calvary had directed Church Mutual to apply the funds to the policies referred to in the accompanying notices, Church Mutual was legally bound to apply the payment as directed or return the payment. *See, In re Zurliene,* 97 B.R. 460, 465–66 (Bankr.S.D.Ill.1989). But there is a kernel of truth in Church Mutual's argument: how can Church Mutual be said to have accepted Mt. Calvary's counter-offer when Kleinschmidt, Church Mutual's agent for these purposes, saw only the check and did not understand that Mt. Calvary was making a counter-offer. Indeed, she wrote the July 18, 1993 letter specifically stating that Church Mutual was applying the payment in a way inconsistent with the notion of acceptance of the counter-offer. But writing the letter was the second thing that she did. The first was applying the check. Church Mutual cites *Loeb v. Gray,* 131 Ill.App.3d 793, 86 Ill.Dec. 775, 475 N.E.2d 1342 (1985), for the requirement of mutual assent in contract formation.

But, remember that Church Mutual could "assent" to the counter-offer by negotiating the business check. The Restatement of Contracts § 19, Conduct as Manifestation of Assent provides:

---

**3.** Church Mutual reads too much into the space on the standard form that includes the amount due. As discussed above, this Court does not conclude that payment in the exact amount of earned premium due is an essential part of the

offer—it is merely informational. If, for example, Mt. Calvary had tendered a cashier's check in the amount of $293.00 within the 10-day limit, there is no doubt that Church Mutual would have accepted the payment.

(1) The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act.

(2) The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or *has reason to know* that the other party may infer from his conduct that he assents.

(3) The conduct of a party may manifest assent even though he does not in fact assent. In such cases a resulting contract may be avoidable because of fraud, duress, mistake, or other invalidating cause. (emphasis added)

The depositing of Mt. Calvary's check was a manifestation of Church Mutual's assent to the counter-offer—Church Mutual intended to cash the check *and* had reason to know that Mt. Calvary might infer assent from the act of negotiating the check. What Kleinschmidt intended subjectively is not determinative—it is Church Mutual's objective manifestation that controls. *See, Laserage Technology v. Laserage Labs.*, 972 F.2d 799, 802 (7th Cir.1992); E. Allan Farnsworth, *Contracts* § 3.6 (2d ed. 1990); E. Allan Farnsworth, *"Meaning" in the Law of Contracts,* 76 Yale L.J. 939, 943–44 (1967). A person has "reason to know a fact if that person has information" from which a person of ordinary intelligence would infer that the fact in question exists. There is also reason to know if the inference would be that there is such a substantial chance of the existence of the fact that if exercising reasonable care with reference to the matter in question, the person would predicate his action upon the assumption of its probable existence. Restatement (2d) Contracts § 19, comment (b).

Even assuming that the notices of cancellation (but not the check) were somehow lost between the mail room and Kleinschmidt's desk, her experience and her computer screen told her what the payment was for. She knew that cancellation notices were priority matters for insureds. She knew that of the six policies that appeared on her screen under Mt. Calvary's account number, three could be reinstated as of July 18, 1989. While generally insurance companies may not be obligated to manipulate numbers in an attempt to decipher the insured's intent with respect to payments, here, the intent was so apparent that basic curiosity should have compelled her to add the total premiums due for the three policies capable of reinstatement and see that the check was for that exact amount.

■ But suppose Church Mutual simply made a mistake. Unilateral mistake does not make a contract voidable except under extraordinary circumstances not present here. *See generally,* Restatement (2d) Contracts § 153. The "mistake" occurred because Church Mutual either ignored or lost the notices of cancellation that accompanied Mt. Calvary's check and refused to attempt to ascertain Mt. Calvary's intent through non-burdensome inquiry, even though the information available to it and prior experience suggested that the check was probably intended to pay outstanding premiums on policies subject to current cancellation notices. Therefore, Church Mutual accepted the Mt. Calvary counter-offer and Kleinschmidt's alleged mistake as to the effect of depositing the check does not rise to the level necessary to void enforcement of the ensuing agreement.

### OTHER ARGUMENTS

#### A. Duty of Care

■ The Defendants also urge that insurance companies owe a duty of good faith, reasonable care and diligence to their insureds. *Cleary v. County Mut. Ins. Co.*, 63 Ill.App.3d 637, 20 Ill.Dec. 547, 548, 380 N.E.2d 525, 526 (1978); *Village of Winfield v. Reliance Ins. Co.*, 64 Ill.App.2d 253, 212 N.E.2d 10, 12 (1965). However, these cases apply only to the duties owed by an insurer during the process of *writing* and *issuing* policies for insureds. They do not hold that there is a higher duty of care required for the application of premiums to insured's accounts. The Court has found no case law suggesting that an insurer owes a higher duty than reasonable care in this context, or that insurance companies must apply premium payments in a way that most benefits the insured. Reasonable care under the circum-

stances would require more than what was done.

### B. *Prior Course of Dealing*

■ Let us turn to the Defendants' argument that payment by business check in fact conformed to the Church Mutual offer because of a prior course of dealing between Church Mutual and Mt. Calvary. A course of dealing is a sequence of previous conduct between parties to a transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct in later similar transactions. 810 ILCS 5/1–205;[4] *Capitol Converting Equip., Inc. v. LEP Transp., Inc.*, 965 F.2d 391, 395 (7th Cir. 1992). This definition applies to all types of commercial contracts. *Id.* at 395 n. 5. Whether a course of dealing exists between the parties is a factual question; there is no specific amount of prior conduct that is required to establish a course of dealing as a matter of law. *Id.* at 395. Clearly, a single transaction is insufficient to give rise to a course of dealing. *Kern Oil & Ref. Co. v. Tenneco Oil Co.*, 792 F.2d 1380, 1385 (9th Cir.1986), *cert. denied*, 480 U.S. 906, 107 S.Ct. 1349, 94 L.Ed.2d 520 (1987); *In re Frederes*, 98 B.R. 165, 167 (Bankr.W.D.N.Y. 1989); *Accutool Precision Machining, Inc. v. Denver Metal Finishing*, 680 P.2d 861, 863 (Colo.App.1984); *Sun River Cattle Co. v. Miners Bank of Mont. N.A.*, 164 Mont. 237, 521 P.2d 679, 688 (1974). Hundreds of deals between the parties, in contrast, may establish a course of dealing. *Capitol Converting Equip. v. LEP Transp.*, 750 F.Supp. 862, 867 (N.D.Ill.1990).

An example is illustrative. An insurance company canceled coverage on six separate occasions. *Bergdorf v. Allstate Ins. Co.*, 541 So.2d 716 (Fla.App.), *cert. denied*, 551 So.2d 460 (1989). The insured tendered late payments each time, and each time the policy was reinstated. The seventh time the policy was canceled the insured sent a late payment which was rejected. The Florida court held that the conduct of the insurance carrier of consistently reinstating coverage after notifying the insured of cancellation had estab-

lished a uniform conduct of doing business to allow the insured to rely thereon. *Id.* at 717.

■ The Defendants maintain that Church Mutual's acceptance of Mt. Calvary's business checks on prior occasions established a course of dealing between the parties upon which Mt. Calvary reasonably relied. But unlike the insurer in *Bergdorf,* Church Mutual only accepted a business check in the face of a cancellation notice twice—In January, 1989 pursuant to the one-time forgiveness rule, and once pursuant to a special payment agreement. While Church Mutual may have accepted business checks for reinstatement of other policies, or for timely paid premiums for the Policy, the Defendants have not shown sufficient deviations to constitute a course of dealing.

■ The Defendants further argue that because Church Mutual never rejected a business check from Mt. Calvary in the past, the right to dictate the mode of payment in the future was waived. Waiver is a voluntary and intentional relinquishment of a known right. *Horning Wire Corp. v. Home Indem. Co.*, 8 F.3d 587, 590 (7th Cir.1993); *Kelly v. Economy Fire & Cas. Co.*, 196 Ill. App.3d 337, 142 Ill.Dec. 898, 899, 553 N.E.2d 412, 413, *appeal denied*, 132 Ill.2d 546, 555 N.E.2d 377 (1990). To be sure, an insurance company may waive written contract provisions through its conduct. *Horning Wire*, 8 F.3d at 590; *Spiers v. Union Life Ins. Co.*, 345 Ill.App. 351, 103 N.E.2d 165, 168 (1952). Moreover, if the insurer's conduct leads the insured to believe that a forfeiture provision will not be enforced, the insurer will be estopped from taking advantage of such forfeiture. *Time Ins. Co. v. Vick*, 250 Ill.App.3d 465, 190 Ill.Dec. 48, 51, 620 N.E.2d 1309, 1312 (1993). Whether such waiver or estoppel occurred is a question of fact. *Kelly*, 142 Ill.Dec. at 899, 553 N.E.2d at 413; *Spiers*, 103 N.E.2d at 168.

■ In this case, the Policy is silent regarding the form of payment required for payments of either timely or tardy premiums. The cancellation notices, in contrast, explicitly demand payment in the form of a

---

4. Formerly Ill.Rev.Stat. ch. 26, para. 1–205.

money order or cashier's check. Church Mutual is understandably unwilling to bear the risk of accepting personal checks from insureds who are perpetually delinquent in their payments. Church Mutual asserts that it did not voluntarily relinquish the right to demand money orders and cashier's checks in the future by accepting personal checks on prior occasions. The Court agrees. Past forgiveness pursuant to a clear internal rule does not preclude Church Mutual's later insistence on compliance with the terms of cancellation notices. *Kelly*, 142 Ill.Dec. at 900, 553 N.E.2d at 414. The clarity of Church Mutual's rule is subject to some doubt. However, in the absence of more substantial evidence of non-compliance with the stated procedure, waiver is not supportable.

This is not to condone the actions of Kleinschmidt with respect to her handling of this matter. Church Mutual's "one time only" rule was undisclosed to insureds. From Mt. Calvary's perspective, Church Mutual was willing to accept business checks because it had done so in the past for both timely and delinquent premium payments. Further, Barron spoke with Kleinschmidt on July 20, 1989 regarding the application of the check. At that time, the Policy had not been canceled (or the cancellation was not yet effective), and Mt. Calvary could have kept its coverage in place by mailing a cashier's check or money order within the next two days. However, Kleinschmidt informed Barron that the Policy was canceled with no hope for reinstatement. This statement was untrue and inconsistent with the terms of the reinstatement letter. Moreover, Kleinschmidt knew that Church Mutual would have accepted an otherwise conforming payment as much as ten days late without interrupting Mt. Calvary's coverage. Kleinschmidt failed to inform Mt. Calvary of this fact as well. This activity is hardly consistent with Kleinschmidt's testimony about helping the insureds.

### C. *Modifications*

■ The Defendants suggest that even if the cancellation notices required Mt. Calvary

to send separate certified checks or money orders for the exact dollar amount of the deficiencies of each policy, they may still prevail. They maintain that the cancellation notices may be construed as modifications of the Policy. Modifications of insurance policies must be approved and accepted by the appropriate state authorities. 215 ILCS 5/143.[5] Such approval is evidenced by a formal endorsement from the state insurance commissioner. Church Mutual concedes that an amendatory endorsement was not obtained in this case, but maintains that it was unnecessary. While the Notice in this case may reasonably be construed as an attempted modification of the course of dealing between the parties, it was not a modification of the Policy requiring additional state approval.

### *SEAWAY'S CONCERNS*

■ Seaway maintains that it was protected under the mortgage clause regardless of whether Mt. Calvary was covered under the Policy. Mortgage clauses create an independent relationship between the insurance provider and the mortgagee. *Seventh Avenue Boutique, Inc. v. Aetna Ins. Co.*, 573 F.Supp. 1027, 1028 (N.D.Ill.1983); *Aetna State Bank v. Maryland Cas. Co.*, 345 F.Supp. 903, 905 (N.D.Ill.1972). When the insured fails to pay premiums, the mortgagee is obligated to make the payments. Mortgage clauses are designed to protect the interests of the mortgagee from the insured's default. 5A *Appleman's Insurance Law & Practice*, §§ 3401, 3402; 10A *Couch on Insurance 2d* § 42. Thus acts or omissions by the insured do not terminate the mortgagee's rights. *General Motors Acceptance Corp. v. Western Fire Ins. Co.*, 457 S.W.2d 234 (Mo. App.1970).

Seaway's position was considered in the Memorandum Opinion entered on November 9, 1992, and will not be rehashed here except to adopt the conclusions reached there as part of this document. Because this Court has concluded that the Policy remained in force as to Mt. Calvary after July 22, 1989,

5. Formerly Ill.Rev.Stat. ch. 73, para. 755.

there is no reason to conclude that it did not also remain in effect as to Seaway.

### CONCLUSION

Church Mutual's letter of July 10, 1989 constituted an offer to reinstate/continue the Multi–Peril Policy in force if Mt. Calvary tendered the premium due before July 22, 1989 in the form of a money order or cashier's check. Mt. Calvary's tender of its business check in the amount of $1,372.50 on July 13, 1989 was a counter-offer to pay by business check which was accepted by Church Mutual when it deposited the check. Accordingly, the Multi–Peril Policy remained in force as to Mt. Calvary and Seaway through and including the date of the fire in September, 1989.